COMMONWEALTH *vs.* JOHN J. SAFERIAN, JR.

Suffolk.   March 4, 1974. — July 30, 1974.

Present: REARDON, QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Practice, Criminal,* Assistance of counsel. *Constitutional Law,* Assistance of counsel. *Words,* "Effective."

Upon a claim of ineffective assistance of counsel for the defendant in a criminal case, the court examines the particular circumstances of the case to determine whether, as a practical matter, there has been serious incompetence, insufficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer, and, if such is found, whether it has likely deprived the defendant of an otherwise available, substantial defence. [93-98]

While counsel for the defendant in a criminal case involving serious charges should have done much more preparatory work, the deficit of pre-trial preparation was substantially repaired by a two-day proceeding on a motion to suppress, the relatively simple and straight forward nature of the case, and the defendant's continuous access to counsel during the court proceedings; furthermore, the defendant made no showing that there was a resulting forfeiture of a substantial defence. [98-99]

A claim of ineffectiveness of counsel for the defendant in a criminal case was not supported by the fact that counsel might have filed many more pre-trial motions than he did where the defendant did not show that any further motion would have been of value. [99]

THREE INDICTMENTS found and returned in the Superior Court on December 6, 1966, December 9, 1966, and

January 5, 1967, respectively. The cases were tried before *Collins,* J., and motions for a new trial were heard by him.

*Francis John Stolarz* for the defendant.

*Roger A. Emanuelson,* Special Assistant District Attorney, for the Commonwealth.

KAPLAN, J. On February 6, 1967, the defendant was found guilty by a jury, after trial made subject to G. L. c. 278, §§ 33A-33G, of the crimes of armed robbery, larceny of a motor vehicle, and unlawfully carrying a revolver under his control in a motor vehicle. He was sentenced to the Massachusetts Correctional Institution at Walpole for ten to twelve years on the robbery conviction, and for four to five years on each of the other convictions, the three terms to run concurrently. The procedural oddities that occurred thereafter are summarized in the margin.[1] It will be enough to say that the only claim now pressed by the defendant and to be considered by us is that the defendant was deprived of the effective assistance of counsel at the trial level. The claim was considered and rejected on a motion for a new

---

[1] On appeal from the judgments of conviction, assignments of error were not timely filed, and the appeal was dismissed on October 27, 1967, presumably pursuant to G. L. c. 278, § 33F. New counsel's petition for a writ of error, filed June 21, 1968, alleged ineffective assistance of counsel both at trial and in connection with the appeal. This was heard by the special master appointed by this court to hear postconviction matters. He found in his report that the difficulty as to the appeal was due to a mixup and misunderstanding about whether counsel was authorized to represent the defendant for that purpose, and accordingly he suggested that a late appeal should be permitted (as had been done by a single justice in an earlier case). As to ineffective assistance of counsel at the trial, the report was prevailingly unfavorable to the defendant's claim. The single justice, confirming the report, authorized the reinstatement of the appeal from the convictions, and also directed the defendant to move for a new trial before the trial judge, the preferred method of resolving factual disputes concerning the conduct of the original trial. *Earl* v. *Commonwealth,* 356 Mass. 181, 183 (1969). On the reinstated appeal, the defendant assigned two errors, denial of a motion to suppress evidence and refusal to sever trial of the charges; these claimed errors, however, the defendant has abandoned by failing to brief or argue them in this court. The new-trial motion was filed on August 25, 1972, and denied by the trial judge on October 2, 1973, after hearing. From the denial, the defendant took a timely appeal, but by mistake claim of exceptions was not timely made (see G. L. c. 278, § 33B) and the defendant was obliged to move to enlarge his time (§ 33H). On November 20, 1973, a single justice of this court reserved the question whether the late claim of exceptions was to be received, while ordering the appeal from the denial of the new trial to be entered in accordance with G. L. c. 278, §§ 33A-33G, this record to supplement the record on the reinstated appeal from the judgments of conviction. In the circumstances of the present case, where there has been a long drawn out effort to test the adequacy of assistance of counsel at trial, we accept the appeal from the denial of the new trial (see G. L. c. 278, § 33H) and proceed to the merits.

Commonwealth *v.* Saferian.

trial by the same judge who presided at the trial. Previously it had been examined on writ of error by a special master who made findings generally unfavorable to the defendant; the master's report was confirmed by a single justice of this court.[2] We have now reconsidered the entire record.[3]

It will be useful, first, to state the facts as they appeared to the jury. About 9 P.M., October 11, 1966, a robbery occurred at Gibson Liquor Mart in Dorchester. Edward Rubin, the shopkeeper, testified that two men entered the store with guns in their hands, said this was a holdup, and ordered him to open the cash register and put the money on the counter. He obeyed. The robbers ordered Rubin and Walter Stewart, an employee, into the refrigerator at the rear of the store, and, having taken the money, apparently $150, fled. Within three minutes, Rubin and Stewart had let themselves out of the locker. As Rubin was telephoning the police, a motorcycle patrolman arrived, alerted by someone who had glimpsed what was going on in Rubin's store. Before going to police headquarters, Rubin used the patrolman's radio to broadcast a description of the robbers to the police. Rubin and Stewart had both gotten a good look at the men during the three or four minutes of the encounter at the store.

About 10:45 P.M. that night, Officer Emilio Puopolo, on paid detail at Anthony's Pier Four restaurant in the South Boston area, observed a white 1966 Cadillac with a black vinyl top, with three men in the front seat, pull into a space in the parking lot. Earlier Puopolo had been tipped by the doorman of Jimmy's Harborside Restaurant, nearby, to be on the lookout for such a car which had been acting suspiciously that evening in slowly reconnoitering the parking lot at Jimmy's. Puopolo was especially interested because a car matching that description had been stolen a

---

[2] Unfortunately the judge in denying the new trial did not make specific findings, but it is clear that he made an independent decision without relying on the special master's report.

[3] The single justice reserved the question whether the transcript of the hearing before the special master was to be part of the record, but there need be no inhibition about this as it is referred to by both sides.

week before from the Pier Four parking lot while Puopolo was on duty. Puopolo now noted that the driver of the Cadillac was not properly clad to dine at the restaurant. No one got out of the car for several minutes. Puopolo, who was in uniform, approached the car and asked the driver for his license and the car registration. The driver, Daniel A. Daley, Jr., produced neither but offered a serviceman's identification card. The defendant, seated next to the driver, rummaged in the glove compartment, ostensibly to find the registration, but did not produce it. He had no identification and gave the name John J. Tomeo, later shown to be false. The third man, James Donahue, also lacked identification and gave the false name James L. Dean. Puopolo placed all three men under arrest for larceny of the car, and, handcuffing the driver to the defendant, led the three into the kitchen of the restaurant to await a police wagon. While in the kitchen, the defendant made a motion with his free hand toward his ribs or waist. Puopolo thereupon searched the defendant and found a cocked, nickel plated, .38 caliber revolver in the waistband under his coat. Other police officers soon arrived. One of these officers, after a conversation with Puopolo, went to the parked Cadillac and observed by flashlight through the windows that two guns were lying on the floor of the car. Under a search warrant later obtained, the guns were seized. The car was in fact the property of one George Katz and was the car that had been stolen from the Pier Four parking lot. The license plates had been removed and stolen license plates substituted.

At police headquarters, Rubin had been examining photographs supplied by the police, but without result. A call came through about midnight and Rubin was taken to the District 6 station in South Boston where the three men were being held. A lineup was arranged of fourteen or fifteen white males with the three men interspersed. Without difficulty or hesitation Rubin identified the defendant and Daley as the two holdup men. Stewart, arriving at the station about 1 A.M., too late to view the

lineup, saw the three men passing through the station
lobby, and promptly pointed to the defendant and Daley.
In their testimony at trial Rubin and Stewart firmly
identified the defendant and further testified that the gun
taken from the defendant resembled the one used by him in
the robbery. When booked at District 6 the defendant had
$60 in small bills and Daley $250.

Reading the record, we are bound to agree with the
observation of the experienced special master that the
defendant was "apprehended in flagrante delicto" and the
"evidence of . . . [his] guilt was overwhelming." One can
speculate that with superior effort or advocacy on the part
of the defendant's counsel the case against the defendant
might have been made to appear less formidable, but that
would be empty conjecture; the truth is that the case by any
lights was very strong.

We must now follow how defendant's counsel behaved
and how he played the few cards he had, reconstructing his
actions from the trial record, the proceedings before the
special master at which counsel and the defendant both
testified, and the hearing on the new-trial motion at which
only the defendant testified, counsel being ill. Counsel, a
veteran of the criminal bar with forty years' experience, was
appointed by the court at the defendant's arraignment to
serve without compensation. He had a talk with the
defendant and advised him to plead not guilty and to waive
commitment to Bridgewater for observation of mental
condition. The defendant did so. Counsel did not consult
with the defendant during the next six weeks preceding
trial; he said it was likely he had spoken in the interim to
the prosecutor, but he had no definite recollection of it.

Before commencement of trial proper, counsel, joined by
the attorney representing the original codefendant Daley,
filed a motion to suppress evidence of the guns including
the one found on the defendant's person. The hearing on
this motion occupied the better part of two days. The facts
developed have been mentioned above as they were re-
peated on trial to the jury. Conceivably the motion had

some possible merit as to Daley; it had minimal validity in respect to the defendant,[4] and was denied by the judge as to both defendants with specific findings of fact.

Counsel for the defendant engaged fully in the examination of every witness at the hearing on the motion to suppress as well as at trial,[5] and something should be said here about his style. As counsel testified before the special master, his regular method of trying cases relied little on pre-trial preparation and much on impromptu cross-examination of prosecution witnesses.[6] In cross-examination he seemed to favor a bludgeoning frontal attack intended to unsettle the witness, in hopes that falsehood or faults of observation would emerge. His questions were frequently allusive rather than precise. Altogether it was a rather undirected or unfocussed example of the older, florid style of examination. In this case the method made little impression as the witnesses at voir dire held firm and repelled all assaults. Counsel had no better success later before the jury.

When the motion to suppress failed, Daley pleaded guilty, and counsel advised the defendant to change his plea and do the same. The defendant declined, and the prosecution continued against him alone. At the trial proper, counsel persisted with extended but futile cross-examination of Commonwealth witnesses, his task being aggravated by the defendant's insistence that he pursue particular lines of interrogation, and also by the defendant's increasing hostility toward him when the defence deteriorated.[7] The transcript indicates that there were

---

[4] The arguments evidently were that there was no probable cause for arrest and that the search was not incident to the arrest.

[5] As the special master said, "[Counsel's] conduct of the trial was by no means lackadaisical or perfunctory."

[6] "I do not find," said the special master, "that because . . . [counsel] was serving without compensation . . . he gave Saferian's cause any less preparation than he gave to cases where he was compensated. In short, he tried Saferian's case as he would any other, relying primarily on what he could develop at the trial."

[7] The defendant testified before the special master that he thought counsel had been appointed to serve without compensation by way of punishment because

Commonwealth *v.* Saferian.

numerous conversations between the defendant and counsel as the trial went on. In most but not all instances counsel seems to have done as the defendant asked; one or two suggestions were useful, another resulted in allowing a somewhat damaging enlargement of the prosecution's scope of redirect examination.[8] At one stage the defendant addressed the court, complaining that counsel had not attended him between arraignment and trial, and indicating that he wanted to bring out that the lineup evidence by Rubin was tainted by the alleged fact that Rubin had visited him in the cell block area at District 6 just before the lineup. (Counsel's cross-examination of Rubin had already indicated awareness of this lurking possibility.) With great patience the judge allowed the matter to be pursued by means of a voir dire hearing. Two lawyers were called who had represented the arrested men at the lineup. Counsel conducted the examinations; they came to nothing; the defendant acknowledged that he was satisfied and was content that these witnesses not be called to give their testimony before the jury.

The defence presented no witnesses and the defendant did not take the stand. (He was embarrassed by a criminal record.) Counsel's closing argument to the jury, besides praying leniency, reminded them of the Commonwealth's burden, questioned the opportunity of Rubin and Stewart to fix in their minds the appearance of the robbers, and attempted to show inconsistencies in the testimony identifying the gun taken from the defendant as one of those used in the robbery. The argument was no more effective than the substantive case that could be made for the defendant on the basis of the evidence. It remains to say that counsel had taken objections to questions put by the prosecution, resulting in a few favorable rulings by the judge. There were exceptions to the denial of the motion to suppress as well as

counsel had annoyed the appointing judge by turning up late for another case on the day of the arraignment. The special master called this "preposterous."

[8] The prosecution was thus enabled to get in testimony about the suspicious behavior of the car at Jimmy's Harborside Restaurant.

to a refusal by the judge to sever the charges for trial. Counsel did not move for directed verdicts. He made a suggestion to the judge for an addition to the charge, but did not press it.

The decided cases try to express or approximate in varying forms of words a general standard for determining whether "assistance of counsel" has been provided an accused person within the meaning of the Sixth Amendment. It has been said that the standard is not met where inadequacy of counsel has turned the proceedings into "a farce and a mockery,"[9] or has created "an apparency instead of the reality of contest and trial."[10] Some cases call for "counsel reasonably likely to render *and rendering* reasonably effective assistance."[11] Still others speak of situations where "the attorney has in effect blotted out the substance of a defense."[12] But whatever the attempted formulation of a standard in general terms, what is required in the actual process of decision of claims of ineffective assistance of counsel, and what our own decisions have sought to afford, is a discerning examination and appraisal of the specific circumstances of the given case to see whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence. *Com-*

---

[9] See *Commonwealth* v. *Lussier,* 359 Mass. 393, 395 (1971), and *Commonwealth* v. *Bernier,* 359 Mass. 13, 17-18 (1971), which quotes from *Mitchell* v. *United States,* 259 F. 2d 787, 793 (D. C. Cir. 1958), cert. den. 358 U. S. 850 (1958), and *Scott* v. *United States,* 334 F. 2d 72, 73 (6th Cir. 1964), cert. den. 379 U. S. 842 (1964). See also Waltz, Inadequacy of Trial Defense Representation as a Ground for Post-Conviction Relief in Criminal Cases, 59 Northwestern U. L. Rev. 289 (1964); Finer, Ineffective Assistance of Counsel, 58 Cornell L. Rev. 1077 (1973); Note, 78 Harv. L. Rev. 1434 (1965).

[10] See *Commonwealth* v. *LeBlanc,* 364 Mass. 1, 14 (1973).

[11] See *Commonwealth* v. *Bernier, supra,* 359 Mass. at 17 (1971), quoting *MacKenna* v. *Ellis,* 280 F. 2d 592, 599 (5th Cir. 1960).

[12] See *Matthews* v. *United States,* 449 F. 2d 985, 994 (D. C. Cir. 1971) (concurring opinion), cited in *Commonwealth* v. *LeBlanc, supra,* 364 Mass. at 14 (1973). See also *Scott* v. *United States,* 427 F. 2d 609, 610 (D. C. Cir. 1970).

*monwealth* v. *Libby,* 358 Mass. 617, 621-622 (1971). *Commonwealth* v. *Bernier,* 359 Mass. 13, 19-24 (1971). *Commonwealth* v. *Lussier,* 359 Mass. 393, 395-398 (1971). *Commonwealth* v. *LeBlanc,* 364 Mass. 1, 10-14 (1973). See *Moore* v. *United States,* 432 F. 2d 730, 735 (3d Cir. 1970) (en banc); *Rastrom* v. *Robbins,* 440 F. 2d 1251, 1253 (1st Cir. 1971).

In the present case the defendant complained to the special master, to the judge on the new-trial motion, and now to this court, that, excepting counsel's talk with the defendant at arraignment, counsel failed to prepare the case ahead of trial — there is no complaint directed separately to counsel's actions in court.[13] Counsel did not go over the facts with the defendant, or seek to interview the prospective witnesses, or ask the prosecutor for material, or make routine pre-trial motions apart from the motion to suppress. He relied on cross-examination and argument.

We agree that counsel should have done much more preparatory work. Situations can be imagined — and one was realized in *United States* v. *Wight,* 176 F. 2d 376, 378-379 (2d Cir. 1949), cert. den. 338 U. S. 950 (1950) — in which trial could be adequately prepared by no more than a fifteen-minute interview with the defendant. See *Commonwealth* v. *Bettencourt,* 361 Mass. 515, 517-518 (1972). See also *Callahan* v. *Russell,* 423 F. 2d 450 (6th Cir. 1970). But such situations must be rare, particularly where serious offences are charged. And dependence on improvised cross-examination alone, even if it will surely be of virtuosic quality, is not to be recommended.

Here, however, we think the deficit of pre-trial preparation was substantially repaired by the fact that counsel was thoroughly accessible to his client during the two-day proceedings on the motion to suppress and again for the two days of the trial itself. As indicated, the defendant was continually, even annoyingly, at counsel's ear while the

---

[13] Before the special master, counsel referred to himself as an "amicus curiae," and the defendant seized on this as indicating that counsel did not regard himself as an advocate on the defendant's behalf. It is apparent that counsel used the words only in relation to his serving without compensation.

case went forward. It is hard to believe that in the end any aspect of the matter plausibly helpful to the defendant was ignored or skimped. The case, after all, was relatively simple and the evidence straightforward. Moreover the motion to suppress served as a kind of preparation for the trial proper because much of the trial was repetitious of the testimony on the motion. We cannot disagree with the trial judge's statement at the close of the new-trial hearing that counsel "gave his client at the trial . . . effective assistance. Everything that could be done for him."

If it were thought that the deficiency in pre-trial preparation was not in fact made good, still we think the defendant could make no headway in the absence of a showing that the fault probably resulted in forfeiture of a substantial defence. *Commonwealth* v. *Lussier,* 359 Mass. at 397 (1971). *Moore* v. *United States,* 432 F. 2d at 735 (3d Cir. 1970). *Rastrom* v. *Robbins,* 440 F. 2d at 1254 (1st Cir. 1971). *West* v. *Louisiana,* 478 F. 2d 1026, 1035 (5th Cir. 1973) (rehearing en banc granted September 5, 1973). *Beasley* v. *United States,* 491 F. 2d 687, 696 (6th Cir. 1974). See Finer, Ineffective Assistance of Counsel, 58 Cornell L. Rev. 1077, 1088, 1091 (1973).[14] Here the defendant, advised by a new attorney, had ample opportunity after the event to point out to the special master or the trial judge some issue of fact or law that could have been but was not exploited by counsel for the defendant's benefit in the original proceedings. His failure to mention such an issue is significant. See *Lamoureux* v. *Commonwealth,* 353 Mass. 556, 561 (1968); *Avery* v. *Alabama,* 308 U. S. 444, 452 (1940); *Chambers* v. *Maroney,* 399 U. S. 42, 60, n. 4 (1970) (Harlan, J., dissenting in part). Compare *Rastrom* v. *Robbins,* 440 F. 2d at 1255 (1st Cir. 1971).

We look at the question of assistance of counsel as a practical not an abstract matter. For this reason we are not

[14] We put to one side cases where the vice is not alleged low-grade representation but conflict of interest or the like, and where it may be urged that a showing of loss of a defence should not be required. See *Commonwealth* v. *Geraway,* 364 Mass. 168, 174 (1973). See also *Commonwealth* v. *Smith,* 362 Mass. 782, 784-785 (1973).

impressed with the defendant's offering us a checklist of the pre-trial motions that could theoretically have been made but were passed over, for he points to no particular motion that would have been of value to the defendant.[15] Indeed — again without condoning the lack of preparation evident here — we would not lend encouragement to the making of routine pre-trial motions that have no purpose in view except to protect counsel against later charges of incompetence or neglect. See *Commonwealth* v. *LeBlanc,* 364 Mass. at 11-12, 13-14 (1973).

Agreeing that one's surface impression that a trial was fair or that guilt was established is not the end of an inquiry as to whether there was adequate assistance of counsel, we should still not be carried to the opposite extreme of holding that assistance was inadequate when counsel did not conform in some respect to an ideal model of how counsel should collate evidence or otherwise conduct himself. On the latter view, judgments would be under constant attack, and judges "would become Penelopes, forever engaged in unravelling the webs they wove." L. Hand, J., in *Jorgensen* v. *York Ice Mach. Corp.* 160 F. 2d 432, 435 (2d Cir. 1947), cert. den. 332 U. S. 764 (1947). When a verdict has once been taken, the question must be approached on a more pragmatic level.

> *Judgments affirmed.*
> *Order denying new trial affirmed.*

---

[15] The A. B. A.'s Standards Relating to the Defense Function (Approved Draft 1971) are relied on by the defendant to support his contention that counsel was deficient in not filing any of the "normal pre-trial motions." The Standards say, however, that they are "intended as guides for conduct of lawyers and as the basis for disciplinary action, not as criteria for judicial evaluation of the effectiveness of counsel to determine the validity of a conviction." § 1.1 (f).