COMMONWEALTH vs. CHARLES N. JONES
(and a companion case[1]).

Middlesex.  March 9, 1983. — April 26, 1983.

Present: BROWN, CUTTER, & SMITH, JJ.

*Practice, Criminal,* New trial, Conduct of juror, Assistance of counsel.
*Jury and Jurors.*

Independent visits by several jurors during the trial of a criminal case to
the public parking lot where the assaults and batteries charged in the
indictments had occurred did not, in the circumstances, prejudice the
defendants. [693-696]

At the trial of a criminal case the defendants were not deprived of effec-
tive assistance of counsel by defense counsel's failure to cross-examine a
witness about earlier possible inconsistent statements where it ap-
peared that the earlier testimony was not sufficiently different from
the trial testimony to be useful for impeachment and that such cross-
examination might have introduced testimony unfavorable to the de-
fendants [697-698]; nor were the defendants denied effective assistance
of counsel by defense counsel's failure to call a certain woman to
testify, where it appeared that she would have been vulnerable as a
witness [698-700].

INDICTMENTS found and returned in the Superior Court
Department on August 19, 1980.

The cases were tried before *Brady,* J., and motions for a
new trial were heard by him.

*Robert P. Keough* (*Paul G. Keough & Christopher J.
Ryer* with him) for the defendants.

*Mary Allen Wilkes,* Assistant District Attorney, for the
Commonwealth.

CUTTER, J. Jones and Demers (see n.1) on August 19,
1980, were indicted after a probable cause hearing on April
24 and 25, 1980.  They were each charged with assault and

---

[1] Commonwealth *vs.* Joseph P. Demers.

battery upon Joseph Jason by means of a dangerous weapon (a shod foot) during an affray (after a parade in South Boston) in the late afternoon of March 16, 1980. The assault took place in the parking lot of the Kendall Square M.B.T.A. subway station in Cambridge.

From the testimony at trial (November 4-10, 1980) the following events could be found to have occurred. A group of rowdy "teen-aged boys" (the first group), some of whom at least had come from the parade, were in the parking lot. Jason, with a somewhat older group in their 20's (the second group) including two women (Jason's sister and Margaret Carr) and three men, came from the subway. They proceeded to Jason's automobile a short distance from the subway exit. All of them entered the vehicle. Jason proceeded to warm up the engine.

Some of the first group came up and began to rock the vehicle and threatened to tip it over. One of the first group, David Owens, with a knife, knelt by a front tire and pretended, at least, to puncture it. Jason left the vehicle to look at the tire and returned to the driver's seat. He twice attempted to back his automobile but could not do so because people were standing in his way.[2] Jason was punched through the open driver's window and started to leave his vehicle. When he was part way out of the front seat, his coat was pulled up over his head. He ended on the ground with members of the first group brutally hitting and kicking him. Jason was very seriously injured, as photographic exhibits of his badly cut face reveal. Owens took over Jason's vehicle and began driving it around the parking lot. He left it while it was still moving toward Jason. The members of the first group who had surrounded and kicked Jason fled in different directions.

Jones and Demers admitted that they had been present in the parking lot but denied that they were in the group which had attacked Jason. Their testimony in general was corrob-

[2] There was conflicting evidence whether any young women, other than Jason's two female passengers, were near Jason's vehicle.

orated by Michael Clinton.[3] One witness, Eugene O'Connell, then nearly forty and a senior technical specialist for Polaroid Corporation, was in an automobile facing the subway exit waiting for his daughter. O'Connell identified Jones and Demers as being members of the first group which had surrounded Jason. Jones, Demers, and Clinton ran from the parking lot, passing close to O'Connell's automobile, and went toward the Charles River. They were identified there by O'Connell and arrested. Jason and two of his passengers were unable to identify Jones and Demers as participants in the assault.

The jury returned verdicts of guilty against Jones and Demers. The defendants appealed from their convictions and the denial of their motions for a new trial. They, however, argue principally issues arising from the denial of these motions. In denying each motion the trial judge made helpful and detailed findings. A single justice of this court granted a stay of sentences, then partly served, on July 28, 1981.

1. *The first motion for a new trial.* The defendants filed on November 13, 1980, a motion for a mistrial based upon an affidavit of the prosecutor that, soon after sentence, an unidentified juror had called him by telephone to inquire about the sentence. The juror then had disclosed that, during the trial, some jurors had gone from the East Cambridge courthouse the short distance to Kendall Square to look at the parking lot where the assault on Jason took place. The trial judge, on November 18, 1980, held a hearing on the motion (which he treated as a motion for a new trial). He examined separately each juror and alternate juror. The transcript of the hearing reveals ample support for the judge's findings and conclusions on the motion.[4]

---

[3] Clinton was a friend of the defendants, who was arrested with them, but against whom probable cause was not found.

[4] The judge found that the two alternate jurors (who did not participate in jury deliberations) did not visit the parking lot during trial. Nine participating jurors also did not visit the scene during the trial. One juror, already familiar with the scene, drove past the station in a taxicab every

The judge at trial had given daily instructions to the jury not to discuss the case. He had twice told them not to make up their minds until after his final instructions. He had emphasized in his charge that the case was to be decided only on the basis of evidence produced in court at trial. He concluded that "the views of the scene produced no probability of prejudice to either defendant," and that it was "extremely unlikely that this . . . [was] a situation where there . . . [would be] any improper influence on the jury." He relied (as we do) on *Commonwealth* v. *Fidler,* 377 Mass. 192, 201-203 (1979), and ruled that there was no "extraneous *disturbing* influence" (emphasis in the original) of the type referred to in *Woodward* v. *Leavitt,* 107 Mass. 453, 466 (1871). See also *Berlandi* v. *Commonwealth,* 314 Mass. 424, 450-453 (1943).

Obviously, independent views by jurors are undesirable and should be forbidden by the trial judge if there appears to be likelihood that they will be undertaken. Counsel should consider arranging for court-supervised views in such cases. We hold, however, that here the evidence was sufficient to establish beyond a reasonable doubt that neither defendant suffered any prejudice from the jurors' visits (without conversation except with other jurors) to a much used public facility. See *Commonwealth* v. *Scanlan,* 9 Mass. App. Ct. 173, 182-184 (1980). Compare *Harrington* v. *Worcester, L. & S. St. Ry.,* 157 Mass. 579, 580-

---

day. Six jurors were familiar with the parking lot because they frequently had used the Kendall Square station. Three jurors did visit the scene. The first of these, on the second day of trial, went there alone in his automobile and merely drove in and out of the parking lot. A second juror drove another juror to the M.B.T.A. station to take the M.B.T.A. train on the day before the trial judge gave his charge. The third juror went to the station to take the M.B.T.A. train (with the second juror) but felt that the diagram used at trial as a "chalk" might be wrong in some respect and looked at a wall behind the station and "at distances" and "how close things were." She did not talk to anyone, at least other than the second juror. All jurors, except one, were aware that one or more other jurors had gone to the scene.

583 (1893).[5] See also *Commonwealth* v. *Royster, post* 970 (1983).

2. *The second motion for a new trial.* New counsel for the defendants filed on May 27, 1981, a motion for a new trial based upon alleged ineffective assistance of defense trial counsel. The trial judge held hearings on these motions on parts of five days (June 5, 10, 11, 17, and 18, 1981) at which evidence was received from defense trial counsel, from various witnesses at trial, from one Deborah Scurini (who had not testified at trial), and from others. There was a full review of the performance of defense trial counsel. The trial judge on July 1, 1981, denied the motion and filed eighteen pages of findings and conclusions.[6]

Jones and Demers, through their new counsel, now contend that their trial counsel was deficient in two principal respects: (1) his failure competently to impeach the testimony of O'Connell, a principal and very effective witness at trial, by showing that, at the probable cause hearing, O'Connell had given testimony allegedly inconsistent with his testimony at trial, and (2) his failure to call Deborah Scurini as a witness. In appraising whether counsel has been effective, we apply the principles of *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974), and *Commonwealth* v. *Rondeau,* 378 Mass. 408, 412 (1979). See *Commonwealth* v. *Sellon,* 380 Mass. 220, 223-229 (1980); *Commonwealth* v. *Moran,* 388 Mass. 655, 660-661 (1983), and cases cited; *Commonwealth* v. *Dutra, ante* 542, 546-552 (1983). See also *Commonwealth* v. *Adams,* 374 Mass. 722, 727-730 (1978). Compare *Commonwealth* v.

---

[5] In denying the motion, the trial judge stated that he considered "that there was overwhelming evidence of guilt in this case."

[6] In this, the judge referred to a recorded conference at trial in which (with the approval of the trial judge, but in his absence and in the absence of the jury) each defendant at the close of the Commonwealth's case indicated that he saw no problem or conflict of interest between them as a consequence of their having the same trial lawyer. Each defendant also then indicated that he was content with the representation being given him by trial counsel.

*Mahdi,* 388 Mass. 679, 685-690 (1983, where the decision expressly did not rest on alleged ineffectiveness of counsel but on inappropriate conduct of the prosecutor). There must be a two-step inquiry in which the defense must establish (1) that trial counsel's conduct was "beyond the range of reasonableness" (see the *Adams* case, 374 Mass. at 730) and fell measurably below that which might be expected under the *Saferian* standard (366 Mass. at 96), and (2) that prejudice resulted. See the *Rondeau* case, 378 Mass. 412-413.

(a) *O'Connell's allegedly inconsistent prior testimony.* The trial judge in his findings reviewed the testimony given by O'Connell at the probable cause hearing, before the grand jury, and at trial. The judge mentioned that "there appears to be an area which . . . [trial counsel] could have delved into," such as O'Connell's testimony "that he did not remember the faces of the individuals that hit . . . Jason." The judge stated, however, that "one must put this in the context that . . . O'Connell also testified . . . [at the probable cause hearing] that both defendants were in the group that was attacking" Jason. The trial judge suggested that cross-examination of O'Connell at trial about earlier possibly inconsistent statements might have resulted in the introduction of unfavorable aspects of O'Connell's testimony at the probable cause hearing. The trial judge concluded that defense trial counsel could have regarded the "trial tactic of using an inconsistent statement" as "debatable" and possibly damaging. He ruled that "ineffective assistance of counsel" had not been shown.

In our review of the second motion for a new trial, O'Connell's testimony at trial and at the probable cause hearing has been compared in detail. He was not shown to have known previously any participant in the affray. His testimony at trial and at the prior hearings, each viewed in context and as a whole, appears to have been a conscientious effort by him to testify only to what he clearly remembered and to avoid saying that he specifically saw either defendant hit or kick Jason. Questions and answers at the probable cause hearing showed that O'Connell could

not connect the rapidly moving feet of those kicking Jason with particular faces. At all times, however, O'Connell was clear, and had no doubt, that each defendant was in the group which surrounded Jason and that he saw the defendants run from the group past his automobile when the group dispersed.

We recognize that defense trial counsel might have been wiser to have had the tapes of the probable cause hearing transcribed (as did successor counsel). He would then have had them available for an attempt to impeach O'Connell. Trial counsel probably could have inquired in more effective fashion about O'Connell's earlier testimony. He perhaps should have preserved his notes of the contents of the tapes. These notes he discarded after the trial. We conclude, however, as apparently did the trial judge, that the defendants have not established O'Connell's earlier testimony to have been sufficiently different from his trial testimony to have made them (as a practical matter) really inconsistent and thus suitable for use for impeachment. Defense trial counsel essentially recognized this at the hearing on the motion.[7]

(b) *The failure to call Deborah Scurini as a witness.* At trial, defense trial counsel had made some effort to establish that there were women, other than Jason's two female passengers, near his automobile during the affray in the parking lot. On this there was conflicting testimony (see note 2, *supra*). Successor counsel, at the hearing on the second motion for a new trial, tried to establish that Deborah Scurini, the "girl friend" of David Owens (who had pretended to puncture a front tire of Jason's automobile with a knife), had been present in the parking lot with Owens and would have confirmed Clinton's testimony. She in fact testified at some length at the hearing on the motion. Her testimony was that she had seen Demers and Jones in the parking lot as Jason's vehicle was being rocked, "standing away from the car when the car was being rocked." When the incident

---

[7] Each defendant had waived the attorney-client privilege.

became more aggressive, she did not see Demers and Jones again or see either of them strike anyone. She admitted that she and Owens, who had pleaded guilty to assault with a dangerous weapon, had been drinking at the parade, but claimed that Demers and Jones, although "friends, but . . . not close friends" of Owens, did not come to help him when he started "just fooling around" with Jason. She denied that either Demers or Jones was "one of . . . [the] four" who were kicking Jason.

Whether there was a telephone talk by Miss Scurini with defense trial counsel was the subject of conflicting testimony. Although she testified that she never talked to defense trial counsel, the trial judge did "not believe her." The judge found that no actual interview took place. He commented that her testimony before him led him "to believe that she might not be a believable witness." He concluded that the reasons of defense trial counsel for not using Miss Scurini as a witness were well-justified and noted that "her testimony would have only been corroborative of that of the defendants and . . . Clinton."[8] Examination of Clinton's trial testimony reveals that this was correct. There was other testimony at the hearing on the motion which strongly suggested that she would have been a vulnerable witness.

(c) *Other issues concerning defense trial counsel.* The defendants at the hearing on the second motion for a new trial argued to the trial judge that defense trial counsel's "preparation of witnesses was evidence of ineffective assistance of counsel." The trial judge found that counsel "did talk to the witness, but only in a general way. He did not 'prepare' the witnesses in the specific matters likely to be . . . [the subject of testimony] at trial." The judge concluded, however, that it had not been shown "that any issue of fact or law could have been but was not exploited by counsel for the defendants' benefit." Examination of the whole

---

[8] Miss Scurini's motion testimony differed slightly from Clinton's trial testimony in that she placed Clinton, Jones and Demers as standing separately at a distance from Jason's vehicle while Clinton placed them as standing together six feet away.

record shows that there was explanation at trial of every aspect of a violent episode which could not have lasted more than a few minutes from the time of the arrival of the second group in the parking lot until the defendants ran from the lot. We hold that there was no showing that defense trial counsel's performance fell below the *Saferian* standard and "that better work might have accomplished something material for the defense." *Commonwealth* v. *Satterfield,* 373 Mass. 109, 115 (1977). See the *Moran* case, 388 Mass. at 660.

> *Orders denying new trial affirmed.*
> *Judgments affirmed.*