Toomey, J.
INTRODUCTION
The defendant Marc Atteridge (“Atteridge”) filed this motion for a new trial, pursuant to Mass.R.Crim.P. 30(b), or for a correction of his sentence, pursuant to Mass.R.Crim.P. 30(a), challenging the judgment entered upon his 1993 jury conviction for three housebreaks in December of 1991 in Blackstone and Upton, Massachusetts.[1] Atteridge contends that he is entitled to a new trial on three grounds: ineffective assistance of counsel, unreliable identification evidence, and improper remarks by the Assistant District Attorney during closing argument. In the alternative, Atteridge contends that he is entitled to a reduction in his sentence because his sentencing as a common and notorious thief was improper.
Based upon a review of the memoranda submitted by counsel and the transcripts attached to the motion,[2] Atteridge’s motion for a new trial is DENIED and his motion for a correction of sentence is also DENIED.
BACKGROUND
The instant motion for a new trial or correction of sentence arises out of the defendant’s August 1993 convictions on eight counts under two separate indictments. The convictions involve three housebreaks committed in Blackstone and Upton, Massachusetts in December of 1991. The first indictment, WOCR 92-0055, contained eight separate counts, of which Atteridge was convicted of four: breaking & entering at night (Blackstone) and 3 counts of larceny over $250 (Blackstone).[3] The second indictment, WOCR 92-0227, contained eleven separate counts; Atteridge was convicted of ten, of which only four are the subject of the instant motions, viz, two counts of entering at night and breaking & entering in day (Upton) and two counts of larceny over $250 (Upton).[4]
The facts underlying the Blackstone housebreak, and other facts relevant to the instant motion, can be summarized as follows:
On December 10, 1991, at approximately 10:30 a.m., Kevin Ryan (“Ryan”) was driving on Mendon Street in Blackstone, Massachusetts. As he passed by the Duval residence at 289 Mendon Street, he observed two males running out of the house, carrying something in their hands. Ryan knew the Duvals and was suspicious after observing this activity. As Ryan was turning his truck around to assess the situation, *317 he observed a white Chevrolet Caprice, with a female driver, pulling out of the driveway. Ryan followed the vehicle a short distance when the passenger in the front seat leaned out of the window and fired several gunshots at him. After following the vehicle for a while longer, Ryan was able to observe the license plate number; he then proceeded to the police department. Ryan gave a description of the male occupants[5] of the Caprice to Officer Mowry of the Blackstone Police Department: the back seat passenger had dark, curly hair and that the front seat passenger, who had shot at him, had dark hair.[6]
Another witness, Harold Lague (“Lague”), was driving a school bus in Millville when the Caprice passed him at approximately 10:45 a.m. Lague noted the license plate number. In a statement to the Blackstone Police Department, Lague described the rear seat passenger as thin, with dark brown or black shoulder-length hair and a thin moustache. He also stated that he was unable to describe the front seat passenger.
On December 11, 1991, after identifying the owner of the Caprice from the license number as Susan Dumas (“Dumas"), Officer Mowry obtained pictures of Dumas, Atteridge, and William Moore (“Moore”), the co-defendant in the two indictments.[7] Each of the pictures was included in separate photograph lineups, each lineup consisting of six photographs. As indicated in Officer Mowry’s police report, both Ryan and Lague identified Moore as the back seat passenger. Ryan was “positive” that Atteridge was the individual who fired at him and Lague identified Atteridge as the front seat passenger. Both also identified Dumas as the driver of the vehicle.
Although she was at first accused in connection with the housebreak, the Commonwealth subsequently moved to dismiss all charges against Dumas when Dumas indicated that the female driver of the Caprice was likely Doreen Arseneau (“Arseneau”), who had been “hanging around” Moore and Atteridge during the relevant time period.[8] Upon questioning by State Police Trooper Thomas Greene, Arseneau admitted to being involved in the Blackstone housebreak, and several others, with Atteridge and Moore. Arseneau told the police that when they observed Ryan drive by during the Duval housebreak, Moore got into the front seat passenger side of the car and Atteridge got into the back seat. She further stated that Moore was the one who shot at Ryan through the front passenger’s window.
The day after the Blackstone housebreak, Officer Todd Brien of the Woonsocket, RI police department approached Atteridge while he was talking on a pay phone in Woonsocket. When Officer Brien asked Atteridge his name, Atteridge responded “David Martin.” Officer Brien also asked him his date of birth and his age, the answers to which did not correspond to one another. Officer Brien attempted to arrest Atteridge who then struck the officer and ran. Atteridge was subsequently located and arrested. At the time of the Woonsocket incident, Atteridge was wanted by the police in Rhode Island for alleged parole violations.
PRIOR PROCEEDINGS
Atteridge’s trial counsel filed a motion to suppress the photographic identifications by Ryan and Lague on the grounds that the photographs used and procedures employed by the police were unnecessarily suggestive. The motion to suppress was heard by the motion judge (Travers, J.) and denied. The issue was raised again before the trial judge (Saris, J.), and again was denied.[9] During the motion to suppress hearing before Judge Travers, Officer Mowry testified that Ryan identified Moore as being the back seat passenger, but later stated that he was the front seat passenger who was shooting at him, a fact which was not included in his police report. Lague testified that the front seat passenger had dark, curly hair and that the person in back seat had long straight hair. Lague identified Moore at the hearing on the motion to suppress as being the front seat passenger and denied ever having identified Moore as the rear seat passenger.
Arseneau had testified against Atteridge and Moore and a third defendant in the separate, earlier trial relating to the China Pacific robbery. All three defendants were found not guilty by a jury in June of 1993. It is important to note that Atteridge was represented by the same attorney in both the China Pacific robbery trial and the Blackstone and Upton housebreaks trial. The transcripts of Arseneau’s China Pacific robbery testimony reveal that she identified herself as the “getaway” driver and the three defendants as the armed, masked men who robbed the restaurant. The transcripts also reveal that cross-examination of Arseneau by all three defense counsel raised challenges to Arseneau’s credibility.
Arseneau again testified against Atteridge and Moore at the Blackstone and Upton housebreaks trial in August of 1993. That trial concluded in a manner more satisfactory to the prosecution than did the China Pacific trial in that the defendants were convicted in connection with the housebreaks. Atteridge was then sentenced as a “common and notorious thief’ pursuant to G.L.c. 266, §40.[10]
DISCUSSION
I. MOTION FOR A NEW TRIAL
Pursuant to Mass.R.Crim.P. 30(b) a trial judge may grant a motion for a new trial “at any time if it appears that justice may not have been done.” Commonwealth v. DeMarco, 387 Mass. 481, 482 (1982). “There are two grounds upon which . . . [the] motion for a new trial [may be based], . . . both [of which] are to be judged according to the standard of whether or not justice has been done. The first relates to the conduct of the trial, and the second is based on newly-discovered evi *318 dence.” Reporter’s Notes to Mass.R.Crim.P. 30(b), citing Commonwealth v. Dascalakis, 246 Mass. 12, 21 (1923). The instant motion rests on the former ground and advances three distinct reasons why “justice has not been done.”
A. THE CLAIM OF THE INEFFECTIVE ASSISTANCE OF COUNSEL
In order to support a claim of ineffective assistance of counsel a defendant must establish “serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer— and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence [sic].’’ Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). Moreover, the “defendant must show, in addition to the claimed ineffectiveness, that ‘better work [by counsel] might have accomplished something material for the defense’ (footnote omitted). Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977).” Commonwealth v. Bolduc, 375 Mass. 530, 540 (1978).
Atteridge asserts that his trial counsel was ineffective in three ways: first, his failure to move to suppress the photographic identification by Ryan and Lague on the basis of unreliability; second, his failure to allege prejudice from the loss of the Atteridge photograph array by the police; and third, his failure to explain Atteridge’s giving a false name and his struggle with, and flight from, the Woonsocket, RI police officer who stopped him the day after the robbery. Atteridge contends that those failures by his trial counsel seriously prejudiced him during the trial, thus entitling him now to a new trial. The Court disagrees.
1. Failure to Move to Suppress Photograph Identifications on Grounds of Unreliability
It is undisputed that Atteridge’s trial counsel did move to suppress evidence of the photograph identifications of him on the grounds that the photographs and procedures employed by the police were unnecessarily suggestive. But Atteridge contends that his trial counsel should also have moved to suppress evidence of the out-of-court identifications by Ryan and Lague as unreliable and evidence of the subsequent in-court identifications as tainted by the unreliable out-of-court identifications. At bottom, Atteridge grounds this “reliability” argument on the apparent inconsistency between, on the one hand, Ryan’s and Lague’s placement, through the photograph arrays, of Atteridge in the front seat and, on the other, Arseneau’s placement of Atteridge in the rear seat. Atteridge argues that the incongruous identification evidence assumed even more prejudicial effect because evidence of Ryan’s and Lague’s photograph identifications was directly contradictory to the trial testimony of the alleged driver of the car, Arseneau, whom Atteridge characterizes as the Commonwealth’s “star" witness. The evidentiary inconsistency, Atteridge now argues, demonstrates the inherent unreliability of Ryan’s and Lague’s identifications.
The problem with Atteridge’s argument in support of his motion for a new trial is that “unreliability,” without more, does not provide a basis for suppression of identification evidence. Rather, it is but one factor to be considered with respect to the suppression issue. In resolving whether or not a photographic identification should be suppressed, the inquiry by the court properly focuses upon the methods used by the police during the procedure and inquires whether the methods were “so unnecessarily suggestive and conducive to irreparable mistaken identification” as to offend due process. Commonwealth v. Venios, 378 Mass. 24, 26-27 (1979). See Commonwealth v. Johnson, 420 Mass. 458, 462-65 (1995) (rejecting “reliability” as a basis for rescuing an otherwise impermissibly suggestive photograph identification procedure). It is the defendant who bears the burden of showing unnecessary suggestion and irreparable misidentification based upon the totality of the circumstances. Commonwealth v. Miles, 420 Mass. 67, 77 (1995); Commonwealth v. Warren, 403 Mass. 137, 139 (1988); Commonwealth v. Botelho, 369 Mass. 860, 866-67 (1976). Unreliability is not, as the defendant would have it, a litmus for exclusion. See Johnson, supra 420 Mass. at 462-65 (reaffirming the Botelho rule of per se exclusion for an impermissibly suggestive identification procedure).
Atteridge concedes that his trial counsel tried not once, but twice to have the photographic identifications suppressed on grounds of unnecessary suggestion.[11] Now, almost four years later, Atteridge contends that the identifications should have been suppressed because of their unreliability and that his trial counsel’s serious inattention to that ground evidences his ineffectiveness. The defendant is, however, on no surer footing today than he was four years ago. Trial counsel moved to suppress based upon the appropriate “unnecessarily suggestive” standard; “unreliability” standing alone was not then, nor is it today, an appropriate basis for suppression.[12] See Botelho, 369 Mass. at 866 (recognizing standard to be “unnecessarily suggestive and conducive to irreparable mis-identification”).
This Court is persuaded, based upon its review of the instant record, that Atteridge’s trial counsel acted well within the scope of professional competence expected of the ordinary lawyer. Atteridge has presented no evidence whatsoever that his trial attorney was “serious[ly] incompeten[t], inefficienft], or inattentive] ... [or otherwise exhibited] behavior . . . falling measurably below that which might be expected from an ordinary fallible lawyer...” Saferian, 366 Mass. at 96. His attorney moved to suppress the photograph identifications on the only available basis for doing so. There is no occasion now to grant a new trial based upon trial counsel’s failure to advance a theory that was, then and now, unsound.[13]
*319 2. Failure to Allege Prejudice from Loss of Photograph Array
Atteridge’s next argument is that his trial counsel was ineffective in failing to allege prejudice from the loss by the police of the Atteridge photograph array. Atteridge contends that his trial counsel should have argued prejudice from his not being able to display the photograph array to the jury in order that it might itself assay the suggestiveness of the array. Atteridge assumes that the texture and look of his photograph in the array was significantly different than the texture and look of the other five photographs in the array. His present claim is that, once those compositional features were pointed out to the jury, Atteridge’s trial attorney might have compellingly argued to the jury that Atteridge’s photograph was chosen by Ryan and Lague not because they saw him in the Caprice, but because his photograph stood apart from the others by the subtle underscoring of textural suggestion.
As the transcript of the relevant portion of the colloquy with Judge Saris indicates, however, she independently reviewed the transcripts and, finding no bad faith, concluded that the facts of the case did not meet the standard for remedial action that obtains in cases of lost evidence. See Commonwealth v. Willie, 400 Mass. 427 (1987). Moreover, Judge Saris stated that she found no indication in the record that any exculpatory information could have come from the Atteridge array. In sum, neither the police conduct nor the composition of the array suggested to Judge Saris that defendant was harmed by its unavailability.
The structural underpinnings of the defendant’s present argument are thus without foundation. Both Judge Travers and Judge Saris independently concluded that there was no impermissible suggestion by the police warranting suppression of the identification. Judge Saris indicated in the transcript that the photograph array was “apparently all done through photocopies . . . [and] unless you show that there’s something other than a photo imagination that something exculpatory were to come of the thing, which I didn’t see in the record, and you’ve had an adequate opportunity. I’m not going to exclude that identification.”
In the face of the rejection by both Judges Travers and Saris of suggestiveness — the sine qua non of his argument — Atteridge must do more now than merely allege some imagined prejudice. His dilemma is the same as impeded his trial counsel; the facts lend no support to his conclusion. The circumstances do not demonstrate the suggestiveness necessary to establish a deprivation at trial of Atteridge’s right to the effective assistance of counsel.[14]
3. Failure to Explain Atteridge’s “Consciousness of Guilt" Conduct
Finally, Atteridge contends that his trial counsel was ineffective in his failure to explain Atteridge’s giving a false name and his struggle with, and flight from, the Woonsocket, RI police officer who stopped him the day after the robbery. Concededly, during the August 1993 trial, Atteridge’s trial counsel did not elicit any information relating to the fact that, on December 11, 1991, Atteridge was in violation of his parole in Rhode Island and might therefore be reluctant to pass the time of day with local law enforcement. Nor did counsel present evidence that Atteridge had extensive family in Woonsocket, thus accounting for his presence there the day after the Blackstone housebreak. Atteridge contends that those two omissions constitute ineffective assistance of counsel warranting a new trial. The Court concludes otherwise.
Post-conviction review of tactical or strategic decisions by trial counsel is performed “with some deference to avoid characterizing as unreasonable a defense that was merely unsuccessful.” Commonwealth v. White, 409 Mass. 266, 111 (1991); see also Commonwealth v. Lamontagne, 42 Mass.App.Ct. 213, 221, rev. denied 424 Mass. 1106 (1997) (unsuccessful tactics or strategies are not necessarily indicative of ineffectiveness). In order to merit a new trial, failed tactical decisions must be shown to have been aggravated. It is not enough for the defendant to demonstrate unreasonableness; he must establish “manifest” unreasonableness to prevail. White, 409 Mass. at 273. Additionally, the trial landscape must be surveyed with a view to whether a different course of action would have better served the defendant and whether that action was reasonably foreseeable prior to trial. Commonwealth v. Drumgold, 423 Mass. 230, 262 (1996) (citations omitted). The analysis must be done without the benefit of hindsight. Id. (citations omitted).
In the present case, four years into hindsight, Atteridge claims that his trial attorney should have elicited testimony or produced some other evidence that he was a parole violator at the time he was arrested in Woonsocket and that his presence there was unremarkable. This, he argues, would have rebutted the inference that he was in Woonsocket, gave a false name, and attempted to flee because he had committed the housebreak in Blackstone the day before. In sum, he faults his counsel for not exposing his unsavory past in order to rebut the suggestion of consciousness of guilt flowing from his actions in Woonsocket.
Arguing that his is the unusual case where it was manifestly unreasonable for counsel to conceal his status as a parole violator, Atteridge contends that not presenting this information was equivalent to conceding to the jury that he was guilly as charged. The Court concludes, however, that his trial attorney’s tactical decision not to trumpet his client’s criminal background was entirely reasonable under the circumstances. To disclose defendant’s past derelictions might well have proved highly prejudicial. Counsel’s cost-benefit analysis was not unreasonable, manifestly or otherwise, and provides no reason now to upset the result of the trial.
*320 B. THE CLAIM OF THE UNRELIABILITY OF THE IDENTIFICATION EVIDENCE
In addition to his related ineffective assistance of counsel claim treated supra, Atteridge asserts that the receipt into evidence of the photograph identifications by Ryan and Lague warrants a new trial because the identifications were unreliable. Contending that the only “reliable piece of identification evidence” was Ryan’s description, in his written statement to the police approximately one hour after the housebreak, of the rear seat passenger as having curly hair, Atteridge argues that Ryan’s and Lague’s photograph identifications the following day were therefore unreliable. Those identifications, however, are entirely consistent with Ryan’s written statement because, if the back seat passenger had curly hair, and Atteridge’s hair was straight, then the back seat passenger must not have been Atteridge. Both Ryan and Lague identified Atteridge, at least initially, as the front seat passenger. Thus, viewing the identifications against the backdrop of the “one reliable piece of identification evidence” conceded by Atteridge, no compelling case can now be made that evidence of the photographic identifications was unreliable or that its admission compels the granting of a new trial.
C. THE CLAIM CONCERNING THE PROSECUTOR’S CLOSING ARGUMENT
Atteridge contends that statements made by the Assistant District Attorney during closing argument were improper, prejudicial, and produced a substantial risk of a miscarriage of justice. More particularly, Atteridge asserts that the statements suggested to the juiy that the Uxbridge police either knew or suspected that Atteridge and Moore had previously committed similar crimes.[15] Arguing that a reference to past similar crimes is the most prejudicial of prior bad act presentations, Atteridge urges this Court to conclude that the improper closing, combined with other errors, produced a substantial risk of a miscarriage of justice.
Segments of closing arguments cannot, however, be viewed apart from the context created by of the entire argument, the judge’s instructions to the jury, and the evidence introduced at trial. Commonwealth v. Wallace, 417 Mass. 126, 131 (1994). In the circumstances at bar, the prosecutor’s statements regarding the actions by the Uxbridge police officers did not convey the impermissble suggestion claimed by Atteridge, but rather presented a clear time line of events for the jury to follow in its deliberations. The statements simply detailed the sequence of events leading to the identification and subsequent arrest of the defendants and urged a “ ‘common sense” assessment of those events. “Reading between the lines” was not a prosecutorial invitation to speculate, but was an exhortation to consider all aspects of the evidence. That view of the prosecutor’s closing is compelling, especially when considered in the context of the totality of the closing argument and the judge’s instructions to the jury. This Court concludes that the prosecutor’s closing argument attempted nothing more than to marshal all the evidence and inferences so that the jury might appreciate the proof from a lineal perspective.
II. MOTION FOR CORRECTION OF SENTENCE
Atteridge contends that his sentencing under the “common and notorious thief’ provision of G.L.c. 266, §40[16] was improper as he was convicted, in essence, of burglary rather than larceny. Atteridge asserts that, upon his conviction for larceny as well as breaking and entering, the larceny count merged with the greater offense of burglary, thus relieving him of the descriptive “thief’ and making G.L.c. 266, §40 inapplicable.
The more sound rationale, however, is that because conviction for larceny and conviction for breaking and entering each required the Commonwealth to prove at least one differing or additional fact, there is no overlap between the two crimes which would call for eliding one of them as duplicative or redundant. See Kuklis v. Commonwealth, 361 Mass. 302, 306-07 (1972); Commonwealth v. Ford, 397 Mass. 298, 302 (1986). Contrast Collins v. Commonwealth, 315 Mass. 167, 169 (1943) (where general conviction on indictment charging both larceny and breaking and entering, larceny merges into breaking and entering count). In the present case, separate guilty verdicts on the individual counts of the indictments do not compel a merger. The larceny conviction remains distinct from the burglary, and defendant may be properly regarded as both a thief and a burglar. Thus, the sentencing of defendant as a thief, under G.L.c. 266, §40, was lawful and defendant’s motion for a correction of sentence will be denied.
ORDER
Based upon the foregoing reasons, it is hereby ORDERED that the defendant’s motion for a new trial be DENIED and his motion for correction of sentence also be DENIED.

 Judge Patti B. Saris presided over Atteridge’s trial in August of 1993. As Judge Saris is no longer a Justice of the Superior Court, Atteridge’s motion for a new trial was not submitted to the trial judge pursuant to Rule 30, but was referred to this Court by the Worcester Superior Court’s Regional Administrative Justice.

 The parties were afforded a hearing upon the instant motion but concurred that no new evidence was required for its disposition and that the documentary submissions would suffice.

 Atteridge was found not guilty of the remaining four counts of the first indictment, two counts of armed robbery masked/disguised, one count of possession of a gun without a license, and one count of possession of a dangerous weapon gun/ammunition without a FID card, after a separate jury trial in June of 1993 in Superior Court (Hely, J.). Those counts related to the armed robbery of a restaurant in Northbridge, Massachusetts called the “China Pacific” (the “China Pacific robbery”).

 As to the second indictment, between April 5 and June 1, 1994, Atteridge was also found guilty of one count of armed robbery masked/disguised, one count of armed robbery, two counts of assault with a dangerous weapon, two counts of possession of a dangerous weapon gun/ammunition without *321 an FID card. These convictions are not the subject of the instant motions. The remaining count, alleging malicious destruction of real/personal property over $250, was dismissed on August 16, 1993.

 The witnesses also gave descriptions of the female driver of the vehicle. Those descriptions are not relevant to the instant motions.

 The photograph of Atteridge taken by the Woonsocket Police Department on December 12, 1991 shows Atteridge with straight hair.

 Officers from the Uxbridge Police Department became aware of the suspicions of the Blackstone Police Department regarding Dumas, Atteridge, and Moore. The Uxbridge police officers went to the Blackstone Police Department and offered pictures of Moore and Atteridge.

 When Moore was arrested on December 17, 1991 he indicated that Dumas was not with him on the day of the Blackstone housebreak.

 Sometime after the denial of the motion to suppress and before the housebreak trial, the photographic array containing Atteridge’s photograph (the “Atteridge array”) was lost by the police. The Court (Saris, J.) allowed testimony regarding the out of court identifications, finding that there was nothing to indicate bad faith on the part of the police or the Commonwealth in the loss of the array and not finding any basis for concluding that the array could have contained exculpatory evidence.

 The docket reveals that Atteridge was adjudged a Common and Notorious Thief under General Laws Chapter 266 Section 40 on August 25, 1993. He was sentenced to a term of from 13 years and 8 months to 20 years on count 6 (larceny over $250) of indictment number WOCR 92-0055. Hewasalso sentenced to terms of from 13 years and 8 months to 20 years on the other larceny counts and from 9 to 10 years on the breaking and entering count of the same indictment, to be served concurrently with the sentence on count 6. As to indictment number WOCR 92-0227, Atteridge was again adjudicated a Common and Notorious Thief under Chapter 266 Section 40 and sentenced as follows: from 9 to 10 years on each of the entering at night and breaking in day counts and from 13 to 20 years on the two larceny over $250 counts all to run concurrent with the sentence imposed on count 6 of indictment number WOCR 92-0055.

 The crux of that argument centered around the quality and texture of the defendant’s photograph as compared with the others in the array.

 “Unreliability” arising from “especially suggestive circumstances” of an eyewitness identification may warrant suppression of an identification. See Commonwealth v. Jones, 423 Mass. 99, 109 (1996). Such, however, is not the case at bar where the suggestive quality of the identification process was demonstrated neither at trial nor here.

 Moreover, Atteridge’s argument presumes the veracity of Arseneau’s trial testimony, a fact which he otherwise vehemently disputes. He ought not to have it both ways.

 Moreover, there was other evidence of Atteridge’s guilt; to wit, Arseneau’s testimony, the discovery of many of the stolen items in Dumas’ basement, and Lague’s in court identification of Atteridge notwithstanding that his testimony regarding Atteridge’s placement in the car differed at trial from his initial comment to the police. See Commonwealth v. Walker, 14 Mass.App.Ct. 544, 548-49 (1982).

 In pertinent part, the statements by the Assistant District Attorney were as follows:
Then the dispatcher put out over the dispatch that number, the one that you see in the photos here, 798-VAH, Susan Dumas’ plate. And, in Uxbridge, you have a guy named Mike Wilson who receives a visit at his house by a fellow officer named Bart he tells you. They hear that name, and they hear that plate number, and some bells go off. This doesn’t involve Uxbridge, but they know they’re cops, they hear of a problem in a nearby town, what do they do on their own, because Wilson is home at the time. He goes over to Blackstone. You’ve got to read between the lines, folks, right You’ve got to use some common sense here.
‘Look, we got some pictures of people you folks might be interested in. Here you go. We got pictures of Moore, we got pictures of Atteridge,’ or a picture of each, whatever. You may want to think about it
(Emphasis added.) Atteridge specifically objects to the emphasized language, supra.

 General Laws chapter 266 Section 40 provides, in pertinent part:
Whoever, having been convicted, upon indictment, of larceny . . . afterward commits a larceny . . . and is convicted thereof upon indictment, and whoever is convicted at the same sitting of the court ... of three distinct larcenies, shall be adjudged a common and notorious thief, and shall be punished by imprisonment in the state prison for not more than twenty years or in jail for not more than two and one half years.