COMMONWEALTH *vs.* GARY F. PLANT.

Plymouth. January 5, 1994. - May 6, 1994.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Practice, Criminal,* Assistance of counsel, Capital case. *Constitutional Law,* Assistance of counsel. *Homicide. Rape. Insanity.*

On appeal from a conviction of first degree murder, no substantial risk of a miscarriage of justice was demonstrated where the defendant did not show that the jury's verdict was unfairly influenced by reason of anything defense counsel may have inappropriately done or failed to do. [715-716]

A defendant convicted of aggravated rape did not demonstrate any prejudice, i.e., he was not deprived of any available, substantial ground of defense, by any alleged ineffective assistance of counsel at trial. [716-717]


INDICTMENTS found and returned in the Superior Court Department on July 9, 1985.

The case was tried before *John F. Moriarty,* J., and a motion for a new trial was heard by him.

*Charles W. Rankin* for the defendant.

*John E. Bradley,* Assistant District Attorney, for the Commonwealth.

O'CONNOR, J. The defendant appeals from convictions of aggravated rape and murder in the first degree and from the denial of his motion for a new trial. The jury found the defendant guilty of murder in the first degree by reason of extreme atrocity or cruelty and by reason of having killed in the commission of a felony punishable by life imprisonment (aggravated rape). While the appeal from the convictions was pending, the defendant moved in this court (see G. L. c. 278, § 33E [1992 ed.]) for a new trial based on the claim

that his trial counsel[1] had furnished ineffective assistance by failing properly to investigate, and effectively to present at trial, an insanity defense. A single justice of this court remitted the motion for hearing and determination by the trial judge. After a hearing, the trial judge denied the defendant's motion, explaining his decision in a full memorandum. We affirm the convictions and the order denying the motion for a new trial.

We summarize the judge's findings in reference to the new trial motion. On May 16, 1985, a young woman's body was found in a secluded area in Middleborough. The young woman had been raped. Her neck had been slashed and her head had been struck with a blunt object. She had been stabbed in the abdomen. By May 22, an intensive investigation led the police to the defendant, who submitted to a lengthy interview at the Middleborough State police barracks. The defendant was arrested three days later. He was taken to the State police barracks, given the Miranda warnings and questioned. The judge found that "the interview was video-taped and in the course of it the defendant made some very damaging admissions, amounting to a confession." Following his arrest, the defendant was evaluated at Bridgewater State Hospital for competency to stand trial and criminal responsibility. "[T]he authorities at Bridgewater reported that he was both competent to stand trial and criminally responsible."[2]

"While the defendant was at Bridgewater," the judge found, trial counsel "contacted Dr. Martin Kelly of Boston whom he knew to be an eminently qualified forensic psychiatrist and asked him to examine the defendant. Dr. Kelly did so. He reported orally to [trial counsel] that he did not believe the defendant had a viable defense of lack of criminal responsibility. After receiving that report [trial counsel] con-

---

[1]The defendant's counsel in connection with the motion for a new trial and the appeal was not his trial counsel.

[2]We do not find in the record support for the finding that the authorities at Bridgewater reported that the defendant was criminally responsible. The absence of that evidence does not affect our decision.

centrated his efforts on attempting to raise a reasonable doubt that the defendant had committed the crimes."

According to the findings, trial counsel moved to suppress the defendant's statements to the police and some materials they had seized pursuant to search warrants. A hearing was held in April, before another Superior Court judge. At the close of that hearing, the Commonwealth moved, pursuant to Mass. R. Crim. P. 14 (b), 378 Mass. 874 (1979), for an order requiring the defendant to disclose whether he intended to rely on a defense of lack of criminal responsibility. That motion was allowed and then, according to the findings, "[i]n response to a question by [the judge], [defense counsel] stated that he had had the defendant examined by a psychiatrist and as things then stood he did not inten[d] to rely on a defense of diminished capacity. [The judge] suggested that the issue should be further explored." As a result of that suggestion, defense counsel moved for authorization to employ a psychiatrist, Dr. John E. Snell, to examine the defendant at the Commonwealth's expense. In an affidavit in support of the motion, counsel stated that the defendant lacked sufficient funds to afford a psychiatrist to determine criminal responsibility and competency to stand trial. That motion was allowed.

We continue with our recitation of the findings relative to the motion for a new trial. After two interviews with the defendant, Dr. Snell wrote to defense counsel. He told counsel that the defendant had told him about his having suicidal tendencies for several years, that the defendant denied any knowledge of the offenses with which he had been charged, saying that on that night he had been walking around trying to kill himself and had one of his episodes of amnesia, and that he had been having hallucinations of dead friends talking to him. Dr. Snell concluded that the defendant was suffering from a thought process disorder which he diagnosed as schizophrenia, undifferentiated type. He stated that the defendant was competent to stand trial and then added the following paragraph:

"With reference to his emotional and mental state at the time of the crime, it is difficult to be as precise as would be desirable in a situation such as this, where the patient denies any recollection of a period of time which allegedly encompasses the time of the crime. It does seem from the evidence available, however, that the patient had been mentally ill for a considerable time before the time in question, that he had been particularly ill in the hours before that time (intensely suicidal), that he had suffered an amnesic period during a period of time which may be close to the time of the crime. I would feel, therefore, that at the time of the crime the patient was suffering from an exacerbation of a chronic schizophrenic illness which would be expected to diminish his capacity to form intent with respect to his actions. If further specific reference to my opinion concerning his mental state at the time of the crime is desired, particularly with reference to criminal responsibility (lack of substantial capacity), I would be happy to comment further."

The judge found that defense counsel "interpreted Dr. Snell's report as meaning that the doctor was of the opinion that the defendant suffered from a diminished capacity (specifically a diminished capacity to form an intent with respect to his actions) at the time of the crime, but was unable to state that he lacked criminal responsibility under the standards of *Commonwealth* v. *McHoul*, [352 Mass. 554 (1967)]. On June 10, 1986, he filed with the court a notice that the defendant intended to introduce evidence at the trial of his case of his '[d]iminished [c]apacity' at the time of the offenses charged in the indictments."

The judge's findings continue:

"After receiving the notice the prosecutor retained the services of another psychiatrist, Dr. Malcolm Porteous Rogers, to examine the defendant and to perform a psychiatric evaluation with regard to his mental

state at the time of the crimes. Dr. Rogers reviewed the defendant's records and interviewed him on July 17 and August 11, 1986. He then filed a sealed report with the court in accordance with the provisions of *M. R. Crim. P. 14(b)(2)(B)(iii)*.

"On June 27, 1986, [the judge] filed a Memorandum of Decision with regard to the defendant's motion to suppress evidence. He found that the defendant's statements of May 22 and May 25 were both given willingly and voluntarily and after a knowing and intelligent waiver of his constitutional rights. With regard to the interview of May 25 he wrote: 'It is abundantly clear that the defendant's decision to waive his constitutional rights on May 25 was the product of an intelligent and knowing mind . . .' With regard to both interviews he wrote further: 'I specifically find that on May 22 and May 25, 1985 the defendant was fully and competently informed of his constitutional rights and that he made a knowing, intelligent and voluntary waiver of said rights, which was the product of a free, willing and rational intellect . . .' The defendant's motion to suppress his statements and the materials seized under the search warrants was denied."

In his memorandum of decision, the judge described the pertinent occurrences at the trial as follows. After the Commonwealth rested on the tenth day of trial, defense counsel told the jury in his opening that he would offer expert testimony concerning the defendant's mental condition when the crimes were committed and when he was interviewed by the police. As a result, the judge made copies of Dr. Rogers's report available to the prosecutor and defense counsel. The judge states:

"Dr. Snell testified late in the afternoon of September 17. He described his two interviews of the defendant and what the defendant had told him about his suicidal tendencies and his hallucinations. He opined that the

defendant was very seriously mentally ill and presumably had been for several years. He opined specifically that in May of 1985 he was suffering from schizophrenia and that it was in a particularly severe stage at that point. He testified that as a result of that mental disorder his ability to make a voluntary, knowing and intelligent statement to the police was substantially impaired. He indicated that the defendant was highly susceptible to suggestion at the time of his interviews, and stated that in his circumstances he would have said anything at all that was required of him. When court was adjourned for the day Dr. Snell had not yet completed his direct examination.

"On the following morning, before the testimony continued, I called a side bar conference to inform counsel as to how I hoped to schedule the remainder of the trial. In the course of that conference I pointed out to [the defense attorney] that Dr. Snell had testified that the defendant was mentally ill but that there had been no claim of lack of criminal responsibility. I told him that I presumed that had been a deliberate decision on his part and asked him if he would like to put his reasons on the record. He replied that he had not been informed by Dr. Snell until after the trial started that there was a possible defense of lack of criminal responsibility, and that having informed the Commonwealth that there would only be a diminished capacity issue raised he did not believe he could change his position in the middle of the trial and assert lack of criminal responsibility. He said that he had not been told by Snell of his opinion as to criminal responsibility until the previous Wednesday or Thursday night when he had gone to see him to discuss his testimony with him, and that he had told the doctor not to mention it at trial because it was then too late to introduce it. I told [defense counsel] that although I appreciated the difficulty of his position, I was concerned that it might lead to a later claim of ineffec-

tive representation by counsel if the defendant was con-victed. I instructed him to continue on with his direct examination and that we could consider the problem later.

"When [the defense attorney] resumed his direct ex-amination he first asked Dr. Snell to summarize his opinion of the defendant's mental state on the day of [the] murder. The doctor responded as follows:

' . . . [it's] my opinion that at that time, in May of 1985, the defendant was mentally ill. That he was suffering from what I have diagnosed as chronic un-differentiated schizophrenia. That he was suicidal. That he was obsessed with death. That he was ob-sessed with feelings of worthlessness and feelings that he was always blamed for things that he didn't do. That he was seeking a way of killing himself. That he was suffering from an illness, one of [whose] main manifestations was that his thinking was disordered, that his logical thought patterns were not available to him so that his judgment would be impaired. His ability to form intent for his actions was impaired. That his ability to respond to questioning was im-paired. In short, that he was suffering from a serious mental illness at that time which would impair his ability to think and to relate to his surroundings and other people.'

"[Defense counsel] then asked the doctor: 'Now, with respect to those dates in particular, would his condition impair his ability to conform to requirements of the law?' The prosecutor objected to the question but I overruled the objection. The doctor answered:

'It would be my opinion that he was so impaired at that time by reason of his mental illness that he would not be able to conform his behavior to the re-

quirements of law or that his ability to do so would be substantially impaired.'

"[Defense counsel] then began to question the doctor as to the defendant's mental condition on May 22 and May 25, the dates of his two statements to the police. After some skirmishing as to the form of the questions, he was permitted to testify that the defendant was still mentally ill on those dates, that his illness affected his ability to give a true statement, that he was so intensely suicidal that a statement admitting guilt would be acceptable to him, and that one of the central parts of his illness was manifested by a tendency to say what was suggested to him. He was allowed to opine that as a result of his illness any statement he made to the police would not be the product of his own free will.

"[Defense counsel] then asked to approach the bench and, when allowed to do so, informed me that he intended to then ask the witness if he had any opinion as to the extent of the defendant's criminal responsibility on May 15 and May 16, 1985. He was seeking a ruling as to whether such a line of inquiry would be permitted.

"I told [defense counsel] that the witness had already testified to an opinion of lack of criminal responsibility, and that I did not think that was fair to the Commonwealth — but also stated that I did not believe the unfairness of the situation was [defense counsel's] fault. At that point the prosecutor intervened and said that she was interested in, 'doing this right the first time.' She pointed out that she did have available the testimony of Dr. Rogers (who had opined that the defendant was criminally responsible) so the unfairness to the Commonwealth of an unanticipated issue was not as severe as it otherwise might have been, and indicated that she felt an instruction to the jury on lack of criminal responsibility was probably mandated on the basis of

the testimony that [defense counsel] had already elicited from Snell.

"I agreed with that analysis. I accordingly permitted the defendant to pursue the issue despite his pre-trial notice that he had only intended to raise an issue of diminished capacity. I required, however, that the witness's opinion be elicited in accordance with the standard of *Commonwealth* v. *McHoul,* [352 Mass. 554 (1967)], and provided counsel with the appropriate language. [Defense counsel] then resumed his examination of Dr. Snell and elicited his opinion, '. . . that at that time in question [the defendant] did lack substantial capacity by reason of mental illness to conform his behavior to the requirements of the law and to appreciate the wrongfulness of his acts.'

"After the defendant rested his case the Commonwealth countered with rebuttal testimony of Dr. Rogers. Dr. Rogers testified that in his opinion the defendant did have substantial capacity to conform his behavior to the requirements of the law and to appreciate the wrongfulness or criminality of his behavior. He also opined that the defendant was not psychotic, was not suffering from an organic brain disorder, was not suffering from chronic undifferentiated schizophrenia, and that there was no disorganization of his thought processes. He testified that the defendant was intellectually normal, but acknowledged that he might be on the low side of normal.

"In my instructions to the jury I instructed them in accordance with *Commonwealth* v. *McHoul* as to [the] meaning of criminal responsibility or lack thereof, and emphasized that the Commonwealth had the burden of proving beyond any reasonable doubt that the defendant was criminally responsible as one of the essential elements of its case. At the request of [defense counsel], I further instructed them in accordance with *Common-*

*wealth* v. *Mutina*, [366 Mass. 810 (1975)] of the conse-
quences of a verdict of not guilty by reason of lack of
criminal responsibility; and, in accordance with the hu-
mane practice mandated by our Supreme Judicial
Court, I also instructed them that they must completely
ignore any statements made by the defendant prior to
and at the time of his arrest unless they were satisfied
beyond any reasonable doubt that those statements were
completely voluntary and the product of a rational
intellect.

"They were also instructed with respect to the mur-
der indictment that in considering the questions of de-
liberate premeditation and extreme atrocity or cruelty
they should take into consideration the mental condition
of the defendant at the time of the offense. They were
told in substance that a person might have criminal re-
sponsibility and yet have a diminished capacity by rea-
son of mental illness to deliberately premeditate his ac-
tions, and that conduct that might be extremely
atrocious or cruel to a normal individual might not be
extremely atrocious or cruel to a person suffering from
such a diminished capacity."

The judge noted that, despite that instruction, the jury found
that the defendant had killed the victim with extreme atroc-
ity or cruelty (they did not find deliberate premeditation).

In addition to the judge's findings concerning the events at
trial, we make one brief observation, favorable to the defend-
ant's present position, about his trial counsel's summation to
the jury. As the defendant's appellate counsel emphasizes,
the thrust of trial counsel's jury argument was not that the
defendant lacked criminal responsibility, but that the Com-
monwealth had failed to prove beyond a reasonable doubt
that the defendant, not someone else, was the victim's assail-
ant. It is true that defense counsel did not argue lack of
criminal responsibility as such. We note, however, that in
support of his contention that the Commonwealth had failed

to prove beyond a reasonable doubt that the defendant was the assailant, defense counsel urged the jury, in assessing the reliability of the defendant's admissions to the police, to consider Dr. Snell's testimony about "the defendant's mental state or whether he lacked criminal responsibility and whether he had diminished capacity and whether he's mentally impaired."

In denying the defendant's motion for a new trial, the trial judge rejected the defendant's contention that his Federal and State constitutional rights to effective assistance of counsel were violated by trial counsel's inadequate investigation, and presentation, of an insanity defense. The judge concluded that trial counsel's performance "passe[d] muster" under the two-part test articulated in *Commonwealth v. Saferian*, 366 Mass. 89 (1974). In *Saferian*, we said, "[w]hat is required in the actual process of decision of claims of ineffective assistance of counsel . . . is a discerning examination and appraisal of the specific circumstances of the given case to see whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Id.* at 96.

The judge reasoned that defense counsel had investigated the possibility of an insanity defense and had obtained the opinion of Dr. Kelly that such a defense was not viable.[3] In addition, he had obtained funds for an examination by Dr. Snell whose letter focused on the defendant's diminished mental capacity as distinguished from lack of criminal responsibility, and he concluded that counsel's "failure to follow up sooner than he did on the rather cryptic message contained in the final sentence of the penultimate paragraph of

_____

[3]The judge, incorrectly we think, was also under the impression that Dr. Kelly's view was confirmed by Bridgewater State Hospital officials. As we have stated in note 2, *supra*, the record does not show that the hospital report addresses the defendant's criminal responsibility.

Dr. Snell's letter . . . was certainly not such serious incompetency, inefficiency or inattention of counsel as could be said to constitute behavior falling measurably below that which might be expected from an ordinary fallible lawyer." The judge found that counsel had reasonably "interpreted the doctor's comment [that he would be happy to comment further with respect to criminal responsibility] as meaning that he had made no such finding [lack of criminal responsibility] but preferred not to state his reasons for not doing so in writing." In any event, the judge concluded, "the defendant was not deprived of an available, substantial ground of defense" by trial counsel's performance because counsel presented the criminal responsibility issue to the jury, the jury were fully instructed on that issue, and "[n]ot guilty by reason of lack of criminal responsibility" was included as one of four possible verdicts on each of the two verdict slips. Because trial counsel presented the insanity defense to the jury, albeit without emphasis, this case differs from both *Commonwealth v. Street*, 388 Mass. 281 (1983), and *Commonwealth v. Westmoreland*, 388 Mass. 269 (1983), in which we held that trial counsels' abandonment of the insanity defense during closing argument deprived the defendant of effective assistance of counsel.

Appellate review of a conviction of murder in the first degree, regardless of whether a claim of ineffective assistance of counsel has been made, is governed by G. L. c. 278, § 33E. The question on appeal is whether, because of an error by defense counsel, the prosecutor, or the judge, or for any other reason, there is a substantial likelihood of a miscarriage of justice unless relief is given. The burden is on the defendant to demonstrate that something inappropriate was likely to have unfairly influenced the jury's verdict. That standard of review, including an evaluation of trial counsel's performance, is more favorable to the defendant than the ineffective assistance of counsel test set forth in *Commonwealth v. Saferian, supra* at 96. See *Commonwealth v. Burke*, 414 Mass. 252, 256-257 (1993); *Commonwealth v.*

*MacKenzie*, 413 Mass. 498, 517 (1992); *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 & n.1 (1992).

We affirm the conviction of murder in the first degree because, applying the G. L. c. 278, § 33E, standard, we are not persuaded that anything defense counsel may have inappropriately done or failed to do was likely to have unfairly influenced the jury's verdict. No showing has been made that, if the verdict is left undisturbed, a substantial likelihood of a miscarriage of justice will result. There has been no showing that better investigation or preparation by counsel would have produced more persuasive testimony by Dr. Snell or more convincing evidence from any other source that, contrary to the testimony of Dr. Rogers, the defendant lacked criminal responsibility. Furthermore, in light of the judge's careful instructions to the jury defining lack of criminal responsibility and placing the burden of proof as to that issue on the Commonwealth, it does not appear likely that counsel's failure to argue the criminal responsibility issue to the jury influenced their verdict. Indeed, in his argument counsel did focus on the defendant's diminished mental capacity, as testified to by Dr. Snell, and the judge's instructions made clear that conduct that might be extremely atrocious or cruel to a normal individual might not be extremely atrocious or cruel to a person suffering from such a diminished capacity.[4] Yet, the jury found that the murder was by means of extreme atrocity or cruelty. We decline to vacate or reduce the murder conviction.

It follows from what we have said that the defendant is not entitled to reversal of the aggravated rape conviction. The standard of review of that conviction is not the "more favorable" one provided by G. L. c. 278, § 33E. *Common-*

---

[4]The trial judge instructed: "Because what might be extremely atrocious or cruel to a perfectly normal individual may not be to a person who suffers from some mental disease or defect which will not deprive him of criminal responsibility, nevertheless is sufficient to constitute diminished capacity and hence makes it unlikely that a person would be extremely atrocious or cruel or that the conduct should be considered that, atrocious or cruel."

*wealth* v. *Wright, supra* at 682. We tend to agree with the trial judge that the defendant's trial counsel's performance did not fall measurably below that which might be expected from an ordinary fallible lawyer, but we need not decide that question because, consistent with our assessment of prejudice in connection with the murder conviction, we are not persuaded that any ineffective assistance of counsel "likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian, supra* at 96.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*