COMMONWEALTH *vs.* MARSHALL K. SMITH.

No. 97-P-1783.

Worcester. March 16, 1999. - August 6, 1999.

Present: KASS, DREBEN, & JACOBS, JJ.

*Practice, Criminal,* Assistance of counsel. *Constitutional Law,* Assistance of counsel. *Evidence,* Hearsay, Fresh complaint.

At the trial of indictments for sexual abuse of a child in which credibility was the main issue, defense counsel's failure to object to inadmissible hearsay testimony that repeatedly reinforced the complainant's accusations created a substantial risk of a miscarriage of justice: a new trial was required. [556-558]

Claims of error at his trial raised by a criminal defendant were without merit and, in any event, unlikely to arise on retrial. [558-559]

INDICTMENTS found and returned in the Superior Court Department on April 29, 1996.

The cases were tried before *Martha B. Sosman,* J., and a motion for a new trial was heard by her.

*Mark J. Pasquariello* for the defendant.

*Thomas W. Dee,* Assistant District Attorney, for the Commonwealth.

DREBEN, J. The defendant was convicted on numerous charges of sexual abuse of his daughter who was nine or ten at the time of the offenses.[1] In his appeal from his convictions and from the denial of his motion for a new trial, he argues, among other things, as he did below, that his attorney was ineffective in a number of respects, particularly in not objecting to certain hearsay statements repeating the claims of sexual abuse. We reverse the defendant's convictions.

In September, 1986, the complainant, who is the defendant's daughter, moved with her brother into the defendant's home.

---

[1]He was convicted of six counts of indecent assault and battery on a child, one count each of unnatural rape and rape of a child, and one count of incest.

Although at first the defendant's second wife and their daughter were part of the household, they and the complainant's brother eventually moved away and, by sometime in 1987 or 1988, the complainant was left alone with her father. At trial, the complainant, then eighteen, testified that when she was nine or ten and alone with her father, he frequently forced her to commit fellatio and to masturbate him. She recounted other details of sexual abuse including claims that her father committed cunnilingus on her. During this period, when frightened, she sometimes went upstairs to sleep in his bedroom. On one occasion, during a thunderstorm, she crawled into his bed. He told her that she could not sleep there unless she was naked. She undressed, and later that night, he partially inserted his penis in her, but stopped when she cried out in pain.

The first time the complainant told anyone about any abuse was in 1992. No indictments, however, were brought against the defendant until 1996, after the complainant had been in counseling for depression.[2]

The defendant in his motion for a new trial argued, as he does on appeal, that counsel was ineffective in not objecting to the admission in evidence of hearsay statements of both the complainant and her mother with reference to the thunderstorm incident and in failing to ask for limiting instructions. In order to determine the effect of the repetitions, we detail the various accounts presented by the prosecutor and the defense.

1. *The various accounts.* The complainant testified that she did not tell anyone of the sexual abuse until 1992. She then told a friend that "when I was living with my father in Ashburnham, he . . . sexually molested me." Shortly thereafter, when she and her mother were about to move to Alaska, her mother informed her that it would be a good idea for her to go to a gynecologist. As set forth in the margin, she then "half-told" her mother about the thunderstorm incident.[3]

Her mother testified that the complainant panicked at the

---

[2]It appears that the complainant did not tell anyone the full extent or frequency of the abuse until she told her counselor and, subsequently, her mother, sometime after the counseling commenced in September of 1994.

[3]The complainant testified: "I told her that at one point in time one night, I had gotten scared and ran upstairs, that he had told me that no one slept in the bed with clothes on. So I had taken off my clothes. And that in the middle of the night he had rolled me over and tried to put something inside of me." She did not indicate what it was that he had attempted to put inside of her.

mention of a gynecological examination and didn't want a doctor telling her mother something that the complainant hadn't told her. The mother then repeated, as set forth in the margin, the account given her by her daughter.[4] After having been informed of the rape, the mother, "extremely upset," called the defendant in Florida, asked him to get their son ready to leave — he had been staying with his father — and stated that she would be there the next day to pick him up. Both the complainant and the mother went to Florida and spoke with Betty Babineau, the defendant's then girl friend (subsequently his third wife). Claiming that she and the complainant were concerned for Babineau's daughter, the mother told Babineau that during the period the complainant "was with [the defendant] . . . she asked to sleep in the bed with him because she got scared from a bad dream, and that he had — she woke up saying, 'Daddy, stop it, you're hurting me,' because he was attempting to put something in her."

The jury heard yet another account of the incident. This one was properly admitted, as the defendant concedes, to introduce an admission by the defendant. After the mother and daughter had spoken to Babineau, the defendant came into the house. The mother testified to the following conversation with the father:

> A. "I told him that [the complainant] had told me about her having had the nightmare, and asking if she could sleep with him, and that she woke up saying, 'Daddy, stop it, you're hurting me,' because he was trying to put something into her, and I asked him if this is what had happened."
>
> Q. "What was his response, if anything?"
>
> A. "Well, he looked at us and he looked at me, and said, 'Well, when you called, I kind of thought this was what we were going to have to talk about at some point in time. I thought this is why you were coming to pick up

---

[4]The mother testified: "[W]hile she was living with her father, after (the father's second wife) had left the house, that on a night that she had a bad dream, that she went and asked him if it was all right if she slept in the bed with him, and he said yes. And then she told me that she woke up saying, 'Daddy, stop it, you're hurting me,' because he was trying to put something into her body."

[complainant's brother].' And he said, 'I figured at some point in time either you and I and [the complainant] as a family, [or complainant] and I were going to have to sit down and talk about this.' And he just looked at her, and no expression or anything, he just kind of shrugged his shoulders and he says, 'I don't know. I don't know what to say. I'm sorry.' And that was it."[5]

Q. "Did you ask him any other questions at that time?"

A. "Yes, I did. I asked him if it was a one shot deal. If this was a one time situation. And I asked him if — if he completed the act."

Q. "What did he say to the first question whether it was a one shot thing?"

A. "He said yes, it was a one time deal."

Q. "And as to the second question whether he had completed the act?"

A. "He told me no."

Betty Babineau testified for the defense. Her account of the Florida conversation with the complainant and her mother was quite different. After the mother had told her that there was concern that the defendant had had sexual relations with his daughter, Babineau asked the daughter what happened. Her answer was, "I got into bed with my dad one night and he rolled over into me." When Babineau asked if he fondled her in some way, her answer was, "No." When she asked if he had put his fingers or his penis in her, the complainant again said, "No."

The defendant's testimony concerning the incident was consistent with Babineau's. He explained that the complainant occasionally slept with him when there were thunderstorms. He would wear gym shorts, she would sleep between the sheets with blankets, and he would sleep on top of the blankets with a quilt over him. On one occasion, he woke up suddenly and found his daughter in his bed, and his arm was on her. She had

---

[5]On cross-examination, defense counsel questioned the mother as to whether she was "distinctly saying to him, I'm asking you questions about sticking something in her body." She answered, "Yes."

on a nightgown. He started yelling and "lost his cool" because he was so scared. He apologized for yelling but indicated to her that she had to let him know so that he could get on top of the covers. He denied putting anything into her.

When asked why he had apologized in Florida when confronted by the mother, he explained:

> A. "I apologized to her, I said, 'Look, I'm sorry it hap-pened because maybe I should not have allowed her to stay in my bedroom when there was thunderstorms or when she was scared.' Maybe I should have moved downstairs and said, 'Look, I'll sleep on the couch, you stay in your room.' But hindsight is 20/20. I didn't see anything wrong with her staying in my bed. She was sup-posed to let me know before she climbed in."

> . . . .

> Q. "Did you have the feeling as a result of that conversa-tion, that you were being asked about actually sticking something inside of her, penetrating her?

> A. "No. No."

2. *Standard of review of defendant's claim of ineffective as-sistance of counsel.* The motion judge, who had been the trial judge, held an evidentiary hearing on the defendant's motion for a new trial and considered the defendant's claims of ineffec-tive assistance of counsel. The question arises as to the standard of review. There is a suggestion in *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163 n.2, cert. denied, 119 S. Ct. 523 (1998), that, by addressing such claims of ineffective assistance of counsel, in ruling on a postverdict motion, a trial judge resur-rects the claimed errors, see *Commonwealth* v. *Hallet*, 427 Mass. 552, 552-555 (1998),[6] with the result that the standard of review is nonprejudicial error.[7] Subsequent cases, however, place a greater burden on the defendant when the claim is one of inef-fective assistance of counsel. See *Commonwealth* v. *Carmona*,

---

[6]The defendant in *Hallett* did not claim that his counsel was ineffective.

[7]"An error is nonprejudicial only '[i]f the [reviewing court] is sure that the error did not influence the jury, or had but very slight effect. . . . But if one cannot say with fair assurance, after pondering all that happened without strip-ping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial

428 Mass. 268, 274, 276 (1998) (substantial likelihood of miscarriage of justice standard),[8] and *Commonwealth* v. *Scott*, 428 Mass. 362, 367 (1998), both G. L. c. 278, § 33E, cases consolidating direct appeals with denials of motions for a new trial. In each instance the motion judge considered claims of ineffective assistance of counsel. In *Scott*, in contrast to the standard of nonprejudicial error which was applied where the resurrected claim was that the court's instructions were incorrect, see *id.* at 365, a standard less favorable to the defendant was used in assessing his claims of ineffective assistance of counsel although these claims were also considered by the motion judge. The *Scott* court stated: "Under G. L. c. 278, § 33E, 'the defendant bears the burden of showing that [defense] counsel's error[s were] "likely to have unfairly influenced the jury's verdict." ' *Commonwealth* v. *Cormier*, 427 Mass. 446, 451 [1998], quoting *Commonwealth* v. *Plant*, 417 Mass. 704, 715 [1994] . . . ." *Id.* at 367.[9] We assume, without deciding, that the appropriate standard in this case is whether a substantial risk of a miscarriage of justice exists. *Commonwealth* v. *Bart B.*, 424 Mass. 911, 914 (1997).

3. *Effect of hearsay testimony.* The judge determined that the hearsay testimony, even if erroneously admitted, was not particularly prejudicial, since its substance was properly introduced to elicit Smith's admission in the confrontation. Moreover, the judge considered the failure to object a tactical decision because:

> "it was in the defendant's interest to have a full exploration of the background as well as the immediate circumstances of this so-called confrontation — that he was the

---

rights were not affected.' " *Commonwealth* v. *Esteves*, 429 Mass. 636, 639 (1999) (citations omitted.)

[8]Where G. L. c. 278, § 33E, is applicable, the defendant's burden of showing a substantial likelihood of a miscarriage of justice has been interpreted to be lighter than in noncapital cases where the burden is to show a substantial risk of a miscarriage of justice. *Commonwealth* v. *Amirault*, 424 Mass. 618, 646 n.20 (1997), and cases cited.

[9]In applying the G. L. c. 278, § 33E, standard, the court in *Plant* stated: "[W]e are not persuaded that anything defense counsel may have inappropriately done or failed to do was likely to have unfairly influenced the jury's verdict. No showing has been made that, if the verdict is left undisturbed, a substantial likelihood of a miscarriage of justice will result." *Commonwealth* v. *Plant*, 417 Mass. at 716.

one to initiate or get into or raise the question of the conversation that the defendant had . . . ."

Since the defendant intended to have Babineau testify about the contents of the statements made to her by the complainant's mother, according to the judge,

> "there was nothing wrong in the Commonwealth getting into it, it was perfectly understandable that [defense counsel] did not object and largely waived any basis for objecting by announcing that the defendant was going to present evidence. It was a strategic choice that was perfectly appropriate."

Similarly, the judge considered it a strategic decision not to confuse the jury with a fresh complaint instruction.

We are not persuaded. The Commonwealth concedes that the complainant's testimony about the disclosure to her friend was inadmissible hearsay. Even if the mother's recounting to Babineau could be seen as an ill-advised waiver intended to obviate any objection to Babineau's subsequent testimony,[10] the complainant's testifying to what she told her mother and her mother's repetition could in no way be viewed as helpful to the defendant.[11] That such testimony explained why the mother went to Florida is not a basis for its introduction. See *Commonwealth* v. *Esteves*, 429 Mass. 636, 638 n.3 (1999).

The credibility of the complainant and of her mother were crucial to the Commonwealth's case. Not only the complainant's claims of sexual abuse, but also the defendant's alleged admission, rested solely on their testimony. To have the details repeated again and again created the risk that the jury would consider the hearsay accounts as substantive evidence that the rape actually occurred. Each repetition was basically consistent with the substantive portion of the complainant's testimony and was an additional reinforcement of the complainant's accusations. See *Commonwealth* v. *Trowbridge*, 419 Mass. 750, 761 (1995).

---

[10]Babineau's testimony, which was also hearsay, could only be used to impeach the complainant's testimony. Problems could arise as to whose testimony was being impeached. See *Commonwealth* v. *McGee*, 42 Mass. App. Ct. 740, 747 (1997).

[11]Contrary to the Commonwealth's argument, the defendant did not attempt to show that complainant's story got better and better in the telling.

Moreover, the repetitions were more problematic than fresh complaint testimony; they were not fresh, nor does the Commonwealth so claim. That the accounts were cumulative of properly admissible evidence does not mitigate the dangers of repetition in this case. All fresh complaint testimony is cumulative, yet we are most wary of its unnecessary repetition. A fortiori, here, where there is no valid hearsay exception, the risk of unfairness is greater. The statements were introduced without any of the safeguards applicable to fresh complaint testimony,[12] and the jury were in no way cautioned as to the limited use of the evidence. In these circumstances, we conclude that there was here a substantial risk of a miscarriage of justice. See *id.* at 762.

4. *Other claims.* The other claims of the defendant are without merit and, in any event, are unlikely to arise on retrial. Defense counsel's failure to interview or call the defendant's second wife or the defendant's mother as witnesses was not ineffective. Although their testimony might have created a question as to the dates the abuse occurred, no matter what dates they testified to, there was a time period during which the complainant lived alone with her father. Moreover, since the motion judge credited trial defense counsel's testimony (at the hearing on the motion for a new trial) that the defendant's dates coincided with those of the complainant, counsel's decision not to interview these witnesses was reasonable. See *Commonwealth* v. *Conley,* 43 Mass. App. Ct. 385, 393 (1997).

The dubious claim of conflict of interest — the defendant filed a complaint to the Board of Bar Overseers about trial counsel prior to trial — was waived, as the judge found, when the defendant agreed to go forward with counsel if Babineau were made available to testify.

The prosecutor did not improperly vouch for the Commonwealth's witnesses by suggesting that they were telling the truth, see *Commonwealth* v. *Raymond,* 424 Mass. 382, 390 (1997), nor did he argue facts not in evidence by questioning the credibility of the defendant and Babineau by suggesting their testimony was false by design or plan. See *Commonwealth* v. *Johnson,* 429 Mass. 745, 750 (1999).

---

[12] In *Commonwealth* v. *Peters,* 429 Mass. 22, 30 (1999), decided after the trial in the present case, the court established that "[t]he complainant in a sexual assault case may testify *only* to the fact that a fresh complaint was made and to whom it was made. The complainant should not be allowed to testify about the details of the complaint." (Emphasis in original.)

Finally, the judge's determination that the pretrial discovery order was not violated based on her interpretation of the order was a reasonable construction of the order and not an abuse of discretion.

Because of the reasons set forth in part 3 of this opinion, the jury's verdict of guilty of rape must be set aside. Since we cannot conclude that that conviction could not have affected the jury's other verdicts involving sexual misconduct, see *Commonwealth* v. *Ross*, 426 Mass. 555, 559-560 (1998), the judgments are reversed and the verdicts set aside on all the indictments.

*So ordered.*