SIN, COMMONWEALTH vs., 100 Mass. App. Ct. 172

 
 COMMONWEALTH vs. RICKY SIN.

100 Mass. App. Ct. 172
 April 14, 2021 - August 23, 2021

Court Below: Superior Court, Middlesex County
Present: Rubin, Kinder, & Desmond, JJ.

 

Constitutional Law, Assistance of counsel. Due Process of Law, Assistance of counsel. Evidence, Alibi, Identification, Expert opinion, Third-party culprit. Practice, Criminal, New trial, Assistance of counsel. Witness, Expert. Alibi.

At the trial of indictments arising from a shooting, counsel's tactical decision not to call certain alibi witnesses was not manifestly unreasonable, where counsel's concern that the witnesses' testimony would be more harmful than helpful to the defense took into account the inconsistencies of the witnesses' stories during counsel's investigation of an alibi defense. [178-180]

At the trial of indictments arising from a shooting, counsel's tactical decision not to specifically identify a person other than the defendant as a possible third-party culprit (or to offer certain hearsay statements to support such a theory) was not manifestly unreasonable, and in any event, even if counsel's failure to prosecute such a third-party culprit defense had amounted to ineffective assistance, the defendant demonstrated no prejudice arising therefrom. [180-183] Rubin, J., dissenting.

At the trial of indictments arising from a shooting, counsel's assertion of a defense that the police failed to perform an adequate investigation, including requesting a jury instruction on such a defense and arguing in her closing that police had not performed certain tests and that certain witnesses were not interviewed, did not constitute ineffective assistance, where, given that such a jury instruction is never required, the defendant could not, even if a better argument could have been made for the instruction, demonstrate prejudice arising therefrom. [183-184]

At a criminal trial, counsel's failure to challenge or impeach certain opinion testimony by a police officer did not amount to ineffective assistance. [184]

INDICTMENTS found and returned in the Superior Court Department on December 10, 2013. 

 The cases were tried before Heidi E. Brieger, J., and a motion for a new trial was heard by her. 

 Sara A. Laroche for the defendant.

 Hallie White Speight, Assistant District Attorney, for the Commonwealth.

 DESMOND, J. The defendant, Ricky Sin, appeals from an order

 Page 173 

 denying his motion for a new trial. [Note 1] On appeal, he contends that his trial counsel was ineffective for (1) abandoning an alibi defense, (2) failing to prosecute a third-party culprit defense, (3) failing to vigorously argue a Bowden defense, see Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980), and (4) failing to challenge unqualified expert opinion offered by the Commonwealth. As a result, he argues that the motion judge erred in denying his motion. We affirm. 

 Background. 1. Trial. At trial, the Commonwealth presented the following facts to the jury. On the evening of September 26, 2013, the victim, Bo Seng, and his girlfriend, Serena, [Note 2] hosted a gathering at their apartment located at 13 Gold Street in Lowell. [Note 3] Among those present at this gathering were Vanara Pan, who was a neighbor and friend of Serena, [Note 4] Vanara Pan's boyfriend, Vannara Rom, and two of the victim's friends, John Chum and Nan Phan. At some point in the evening, Vanara Pan's brother, Chhem Pan, joined the group as well. [Note 5]

 At approximately 10 p.m. that evening, Chum and Phan decided to leave the gathering, and Rom walked outside to the street with them. On the street, they encountered the defendant. Rom testified that he was not necessarily friends with the defendant, but that he had known the defendant since they were children. The group began talking, and Vanara, who was also familiar with the defendant, joined them outside. She exchanged words with the defendant and eventually told him to leave the area. [Note 6] Approximately two minutes later, the defendant walked away and got into

 Page 174 

 the passenger seat of a silver Honda Civic. The vehicle drove away, and both Vanara and Rom testified that they did not recognize the person driving it.

 After Chum and Phan left, Vanara stayed outside with Rom, and was joined at some point by her brother Chhem and the victim. Vanara informed Chhem that the defendant had been looking for him, and this information appeared to upset Chhem. At the same time, the victim was attempting to gain access to his apartment because he had gotten into an argument with Serena, and she had locked him out. At the victim's request, Vanara agreed to go inside to persuade Serena to allow the victim into the apartment. 

 While this was occurring, Rom walked to the rear of 13 Gold Street to throw away a beer. In doing so, he walked down the driveway, which was located to the right of the house. He returned along the same route, and as he approached the front of the house, he saw the victim standing in the alleyway located to the left of the house. He observed the defendant standing two to three feet away from the victim. Rom then saw the defendant raise his arm toward the victim. Rom heard a gunshot and saw the victim fall to the ground. Rom, who was the only percipient witness to testify about the shooting at trial, testified that after the shooting, the defendant walked down the alleyway, Chhem ran down Gold Street, and he (Rom) immediately ran inside the house at 13 Gold Street. Vanara, who was inside the house at the time, heard the gunshot and then saw Rom running up the stairs. They both quickly returned outside to find the victim lying in the alleyway bleeding, and Vanara yelled out for someone to call 911.

 Armando Faria was parked in front of 16 Gold Street picking up a friend at the time of the shooting. While parked, he saw three men standing outside, and then heard the sound of a gunshot. After the shot, he saw two men running and one man lying on the ground. He testified that one of the men was short and skinny, and that man ran down Gold Street. The other man ran down the alleyway, but it was too dark for Faria to observe his features. Faria then heard Vanara yelling, and he dialed 911. The phone call was placed at 10:41 p.m. The police and paramedics responded to the 911 call, and the victim was ultimately transported by ambulance to the hospital.

 At the scene, Lowell police officers interviewed Vanara. While they were questioning Vanara, her brother Chhem stood in the doorway screaming profanities and telling her not to "snitch" or speak to the police at all. Later, the police interviewed Faria, Rom,

 Page 175 

 and Vanara at the Lowell police station. There, Vanara and Rom were independently shown a photographic array containing the defendant's picture. Ultimately, after their investigation, the police placed the defendant under arrest. 

 As a result of the gunshot, the victim sustained a fracture to a bone in his spine and suffered from paraplegia. [Note 7] Some weeks after the shooting, the police visited the victim at the hospital, but the victim declined to speak with them. The victim ultimately discontinued treatment against medical advice and moved out of the Commonwealth.

 At trial, the defendant did not testify or offer any evidence in his defense. Instead, trial counsel sought to undermine the Commonwealth's case by suggesting, through cross-examination of the Commonwealth's witnesses, that the police investigation was inadequate, that Rom's account of the shooting was not credible, and that there was insufficient evidence that the defendant was the shooter. Specifically, trial counsel highlighted that the police failed to perform gunshot residue (GSR) testing on the defendant's clothing, failed to perform deoxyribonucleic acid (DNA) and fingerprint testing on the shell casing that they found, and failed to interview several people present on the night of the shooting. Trial counsel further challenged Rom's account of the shooting by suggesting that from where he was standing, it would have been difficult for Rom to see the shooting occur, especially given that it was dark outside. Trial counsel also underscored the fact that a gun was never recovered and that the victim was unable or unwilling to identify the shooter. At the conclusion of the trial, the jury nevertheless convicted the defendant of assault and battery by means of a dangerous weapon causing serious bodily injury, unlawful possession of a firearm, unlawful possession of a loaded firearm, and discharging a firearm within 500 feet of a building. [Note 8] The defendant timely appealed. 

 2. Motion for a new trial. Thereafter, the defendant filed a motion for a new trial asserting that his trial counsel was

 Page 176 

 ineffective. In support of his motion, the defendant submitted several affidavits and exhibits. The relevant affidavits are summarized as follows. 

 Jocelyn Coppola, the defendant's girlfriend at the time of the shooting, averred that on the evening of September 26, 2013 the defendant was watching their two year old son while she was out with friends. At approximately 9:45 p.m. that evening, she received a cell phone call from Vanara. [Note 9] Vanara told Coppola that the defendant had come to Gold Street, with their son, looking for her. Thereafter, Coppola went to her mother's house at 70 Robbins Street in Lowell, and by the time she arrived at 10:30 p.m., her son had already been dropped off there by the defendant. Coppola's mother averred in her own affidavit that the defendant dropped the son off between 9:30 and 10 p.m. 

 Coppola also stated in her affidavit that she spoke to Chhem on two occasions after the shooting. The first conversation occurred at 5 a.m. the following day. During that conversation, Chhem indicated that he was not awake during the shooting. In the second conversation, however, Chhem stated that he was outside during the shooting but that he could not see who shot the victim. He told Coppola that the shooter was not the defendant. Coppola's affidavit also noted that while Chhem may have believed that he and Coppola had previously been in a dating relationship, in fact they had not. [Note 10]

 Naroht Chan, a potential alibi witness, stated in his affidavit that he was with the defendant on the evening of September 26, 2013. He averred that at approximately 10 p.m. that evening, his girlfriend, Jennie Seng, woke him up to tell him that the defendant was at their house. As a result, he got up and played video games and drank beer with the defendant. Their friend, Swayze Voir, joined them, and the defendant left at approximately 1 a.m. 

 In her affidavit, trial counsel stated that after the trial began, she decided not to call Seng, Voir, or Chan as alibi witnesses, because 

 Page 177 

when she interviewed them in preparation for trial, their statements were inconsistent with their original statements to the defense investigator. She was also concerned that "the witnesses would not be credible and would be impeached with their grand jury testimony." Trial counsel further averred that she made the decision not to call Coppola as a witness because "she presented as anxious and had a tick in her neck." Trial counsel feared that, as a result of those attributes, Coppola would not have been a credible witness. Also, because Coppola had dated both the defendant and Chhem, trial counsel was concerned that Coppola would offer testimony that there was a "beef" between the two men. 

 Trial counsel further averred that she believed that she was precluded by the judge from arguing that a specific person, whether Chhem or Rom, was a third-party culprit. She stated that she "did as much as [she] could, based on the evidence, to suggest that a third party shot [the victim]." With respect to a Bowden defense, trial counsel stated that she argued in her closing that the police failed to do "certain things" during their investigation, and that she requested a Bowden instruction, but the judge declined to give one. Finally, trial counsel stated in her affidavit that she did not remember why she did not challenge the Commonwealth's expert opinion regarding the "timeframe for GSR testing"; she "often consult[ed] a crime scene investigator on questions such as this one," but she did not do so in this case. [Note 11]

 Following a nonevidentiary hearing, the motion judge, who was also the trial judge, denied the defendant's motion. The defendant appealed from the order denying his motion, and that appeal was consolidated with his direct appeal.

 Discussion. "[W]e review the denial of a motion for a new trial for 'a significant error of law or other abuse of discretion.'" Commonwealth v. Duart, 477 Mass. 630, 634 (2017), cert. denied, 138 S. Ct. 1561 (2018), quoting Commonwealth v. Forte, 469 Mass. 469, 488 (2014). In doing so, we grant "special deference" to the views of the motion judge who was also the trial judge. Commonwealth v. Grace, 397 Mass. 303, 307 (1986). 

 To succeed on an ineffective assistance of counsel claim, a defendant must prove (1) that his attorney showed "serious incompetency, inefficiency, or inattention of counsel -- behavior of 

 Page 178 

counsel falling measurably below that which might be expected from an ordinary fallible lawyer -- and, if that is found, then typically, [(2) that] it has likely deprived the defendant of an otherwise available, substantial ground of defence." Commonwealth v. Phinney, 446 Mass. 155, 162 (2006), S.C., 448 Mass. 621 (2007), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). If "the defendant's ineffective assistance of counsel claim is based on a tactical or strategic decision, the test is whether the decision was '"manifestly unreasonable" when made.'" Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), quoting Commonwealth v. Acevedo, 446 Mass. 435, 442 (2006).

 1. Alibi defense. The defendant first argues that his trial counsel was ineffective for abandoning an alibi defense after the trial began. In her opening statement, trial counsel told the jury, "Ricky Sin did not shoot Bo Seng. Ricky Sin was at the Gold Street area somewhere between 9:00 and 10:00 o'clock on the evening of September 26th, 2013. He left that area, he went to visit some family on Fernald Street and then went to his dorm on Gates Street . . . ." The defendant contends that trial counsel was ineffective for making this statement in her opening, but then failing to call any of the witnesses who observed the defendant at Fernald Street. We disagree. 

 This is not a case where trial counsel failed to investigate and pursue an alibi defense. See Commonwealth v. Cepulonis, 9 Mass. App. Ct. 302, 305 (1980) ("failure to investigate and pursue a plausible alibi defense known to, or with normal diligence accessible to, counsel would fall beneath the level of competency expected"). Trial counsel here did investigate an alibi defense, and during the course of her investigation, she learned that the potential alibi witnesses had told varying, inconsistent stories. 

 When the defense investigator originally interviewed Seng, Voir, and Chan in October of 2013, each unequivocally stated that the defendant had arrived at Fernald Street at 10 p.m., thereby making it impossible for the defendant to have been involved in a shooting that occurred at around 10:40 p.m. In November of 2013, however, Seng specifically testified before the grand jury that the defendant arrived at her house "close to 11:00, so basically say 10:40 -- no, no, like 10:50, basically just say ten minutes before 11:00." Further, Voir testified that, when he told the defense investigator that the defendant had arrived at 10 p.m.,

 Page 179 

 he meant anywhere between,"10:00 to 10:30ish, 10:45ish." [Note 12] While it is true that Chan did not testify before the grand jury, and thus could not have been impeached with his grand jury testimony, the statement in his affidavit that the defendant arrived at "approximately 10:00 p.m.," was equivocal, and as the motion judge noted, appeared to come from information his girlfriend relayed to him. If so, that evidence was inadmissible hearsay. See Mass. G. Evid. § 802 (2021). 

 Trial counsel, taking the inconsistencies into account, made a tactical decision not to call these witnesses out of concern that their testimony would be more harmful than helpful to the defense. This decision was not manifestly unreasonable. See Commonwealth v. Norris, 483 Mass. 681, 691 (2019) (where testimony would be inconsistent, not unreasonable to decline to call alibi witness). Furthermore, trial counsel's affidavit reveals that not only were the original statements of Seng and Voir inconsistent with their grand jury testimony, none of the three original statements were harmonious with their stories at the time of trial. As a result, it was unlikely their testimony would have been helpful to the defense, and it was not unreasonable for trial counsel to decline to call them as witnesses. [Note 13]

 Similarly, it was not manifestly unreasonable to decline to call Coppola as an alibi witness. Her version of events, even if believed, did not provide an alibi. Even if the jury heard the defendant's reason for going to Gold Street earlier in the evening, i.e., to find Coppola and drop off their son, it would not explain where the defendant was at the time of the shooting. Moreover, the decision to call a witness is a strategic one. Where the motion judge was also the trial judge, we defer to her assessment that trial counsel's strategic choice was not manifestly unreasonable. See Commonwealth v. Morales, 453 Mass. 40, 45 (2009). "The judge was in the best position to evaluate counsel's decision and [her] 

 Page 180 

performance." Id. The motion judge accordingly did not abuse her discretion in concluding that the decision not to call Coppola was not manifestly unreasonable when made. 

 2. Third-party culprit defense. The defendant also argues that trial counsel was ineffective for failing to definitively assert a third-party culprit defense by arguing that Rom or Chhem was in fact the shooter. We disagree. 

 Although trial counsel did not specifically name Rom or Chhem as the third-party culprit, counsel sought to imply that someone other than defendant was the shooter. Trial counsel's understanding, according to her affidavit and the representations that she made at trial, was that she did not have the requisite evidence to name a specific person as the third-party culprit. This understanding, accurate or not, [Note 14] was confirmed by the judge, who, before closing, cautioned trial counsel against specifically pointing to Rom or Chhem as the third-party culprit. [Note 15] The judge also declined to give a third-party culprit instruction. See Commonwealth v. Scesny, 472 Mass. 185, 206 & n.39 (2015).

 As a result, and in line with the judge's warning, trial counsel did not specifically point to Rom or Chhem as the shooter, but argued in her closing, based on inferences from evidence presented by the Commonwealth, that the shooter was someone other than the defendant. This may have included Rom or Chhem. However, it also may have included Chum, Phan, or someone who was unknown to the victim or the defendant. This argument 

 Page 181 

gave the jury alternative theories upon which to find a reasonable doubt that the defendant was the shooter. 

 "The decision of defense counsel regarding the best defense to pursue at trial is a tactical one . . . ." Norris, 483 Mass. at 690. And in determining whether that decision was manifestly unreasonable when made, we take "into account all the circumstances known or that should have been known to counsel in the exercise of [her] duty to provide effective representation to the client and not whether counsel could have made alternative choices." Kolenovic, 471 Mass. at 674-675. As the defendant argues, there was evidence that had the potential to inculpate Chhem and Rom, such as (1) Faria's testimony that he saw three people just before the gunshot, whereas Rom's testimony indicated that there were four; (2) Faria's description of the shooter in the 911 call as "skinny" and "short," which undisputedly was not a description of the defendant; [Note 16] (3) testimony that Rom and Chhem ran away after the victim was shot, instead of calling 911 or going to his aid; and (4) evidence that Chhem yelled at his sister not to "snitch" immediately after the shooting. There was also evidence that contradicted the theory that the shooter could have been Chhem or Rom.

 To begin, Faria did not identify the shooter at trial. Indeed, his testimony makes clear that he heard, but did not see, the shooting. At trial, he testified only that after the shot had been fired, he saw a short, skinny man running down Gold Street, and Sergeant Murray testified that the individual was Chhem and "not the shooter." In contrast, Rom testified that he saw the defendant shoot the victim. Rom testified that he and Chhem were both standing by the front steps of the home at the time of the shooting. He testified that the victim was facing them when he was shot, and there was other evidence that the victim was shot in the back. As a result, both Rom and Chhem were standing on the side of the victim opposite from where the bullet entered his body. Given that Faria did not personally witness the shooting and that the testimony indicated

 Page 182 

 that the shooter could not have been Rom or Chhem, it was well within the judge's discretion to conclude that it was not manifestly unreasonable for trial counsel not to specifically identify them as possible third-party culprits.

 The defendant further argues that trial counsel was ineffective for failing to offer three hearsay statements to support the theory that Chhem or Rom was the shooter. Hearsay offered as third-party culprit evidence may be admissible "in the judge's discretion, [i]f 'the evidence is otherwise relevant, will not tend to prejudice or confuse the jury, and there are other "substantial connecting links" to the crime.'" Commonwealth v. Silva-Santiago, 453 Mass. 782, 801 (2009), quoting Commonwealth v. Rice, 441 Mass. 291, 305 (2004). First, the defendant argues that trial counsel should have sought to admit Vanara's hearsay statement to Coppola that the defendant was around Gold Street earlier in the evening, with his son, looking for Coppola. This statement, however, says nothing about a third-party culprit and therefore would not have been admissible under the rule. See Commonwealth v. Buckman, 461 Mass. 24, 32 (2011). 

 Further, the defendant argues that trial counsel should have called Coppola to testify about two of Chhem's statements: (1) his statement to Coppola, the day after the shooting, that he was not awake during the shooting, and (2) his subsequent statement that he was outside during the shooting, and that the defendant was not the shooter. Putting aside for a moment trial counsel's strategic reasons for not calling Coppola as a witness, discussed supra, these statements did not substantially connect a third party to the shooting. See Commonwealth v. Wood, 469 Mass. 266, 275 (2014), quoting Buckman, 461 Mass. at 32 (third-party culprit evidence "must have substantial probative value in connecting a third person to the crime"). At most, these statements were contradictory and tended to show consciousness of guilt, which alone was insufficient to demonstrate third-party culpability. Compare Commonwealth v. Conkey, 443 Mass. 60, 68-70 (2004), S.C. 452 Mass. 1022 (2008). The statements did not "point toward any particular third party who might have committed the crime," Commonwealth v. Bright, 463 Mass. 421, 440 (2012), and had the potential to prejudice the Commonwealth and confuse the jury. See Silva-Santiago, 453 Mass. at 801 ("the admission of feeble third-party culprit evidence poses a risk of unfair prejudice to the Commonwealth, because it inevitably diverts jurors' attention away from the defendant on trial and onto the third party"). Accordingly, it is 

 Page 183 

unlikely they would have been admitted at trial. Thus, it was not manifestly unreasonable, especially given trial counsel's concern about Coppola's credibility, not to offer these statements through her testimony. 

 Finally, even if we were to conclude that trial counsel was ineffective for failing to specifically point to Rom or Chhem as the third-party culprit, the defendant has not demonstrated prejudice. See Commonwealth v. Despasquale, 86 Mass. App. Ct. 914, 917 (2014) (ineffective assistance claim fails where defendant fails to demonstrate prejudice stemming from counsel's substandard performance). All of the admissible third-party culprit evidence was brought in through the Commonwealth's case-in-chief and was before the jury for them to consider during their deliberations. Compare Phinney, 446 Mass. at 163-165. Trial counsel argued specifically in her closing that the victim had been shot, but that the defendant was not the shooter (i.e., that someone else was). The jury were free to accept or reject this argument. In sum, the defendant failed to demonstrate that "better work might have accomplished something material for the defense." Despasquale, supra, quoting Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977).

 3. Bowden defense. Next, the defendant asserts that trial counsel was ineffective for failing to "vigorously prosecute a Bowden defense." The argument is unavailing. 

 As observed by the motion judge, trial counsel put forth a Bowden defense, requested a Bowden instruction, and argued in her closing that the police failed to perform an adequate investigation. See Bowden, 379 Mass. at 485-486. The crux of the defendant's argument is that in requesting a Bowden instruction, trial counsel failed to highlight that the police did not interview several "key witnesses": Chhem, Coppola, Chum, and Phan. Notwithstanding the fact that trial counsel, when requesting the instruction, argued that the police investigation was inadequate because certain tests were not performed and witnesses were not interviewed, a Bowden instruction is never required. See Commonwealth v. Williams, 439 Mass. 678, 687 (2003). Accordingly, even if the defendant could satisfy the first prong of the Saferian standard by simply asserting that a better argument could have been made for the instruction, he is unable to satisfy the second prong and demonstrate prejudice. See Saferian, 366 Mass. at 96.

 Further, contrary to the defendant's contention, trial counsel vigorously cross-examined the police witnesses about the failure 

 Page 184 

to perform DNA and GSR testing, as well as the failure to interview certain witnesses, including Chhem, Phan, and Chum. In addition, trial counsel highlighted these failures in her closing argument to demonstrate that the Commonwealth had not met its burden in the case. We accordingly discern no abuse of discretion in the motion judge's conclusion that trial counsel was not ineffective in mounting the Bowden defense. 

 4. Failure to challenge expert opinion. Finally, the defendant argues that trial counsel was ineffective in failing to challenge Sergeant Murray's testimony concerning GSR testing. On cross-examination, the defendant questioned Sergeant Murray about the failure to perform GSR testing on the defendant's clothing at the time of his arrest. On redirect, Sergeant Murray testified that "there's a three-hour window in which [GSR testing] can be completed or the likelihood of finding anything is nil." The defendant contends that not only was this testimony inaccurate, [Note 17] it amounted to unqualified expert opinion, which was left unchallenged by the defendant.

 Putting aside whether Sergeant Murray's opinion was admissible to rebut the Bowden defense, see Mass. G. Evid. § 1107 (2021), the defendant has failed to demonstrate that trial counsel's failure to challenge or impeach this testimony amounted to ineffective assistance. "In general, failure to impeach a witness does not prejudice the defendant or constitute ineffective assistance." Commonwealth v. Bart B., 424 Mass. 911, 916 (1997). We therefore discern no abuse of discretion or error of law in the motion judge's determination that the defendant failed to meet his burden of establishing that his trial counsel provided ineffective assistance or that he was prejudiced as a result.

Judgments affirmed.

Order denying motion for a new trial affirmed.

 RUBIN, J. (dissenting). Introduction. The defendant is serving a sentence of twelve to fifteen years in State prison for shooting

 Page 185 

 Bo Seng in front of 13 Gold Street. A witness, Vannara Rom, a friend of the victim, testified that he saw the defendant shoot Seng. The defendant very well may have shot Seng, although there is nothing in the evidence indicating a motive or reason why the defendant would have done so. Another witness, this one disinterested, is the person who called 911 about the shooting, and in that call, when asked for a description of the shooter, he provided a description of someone "skinny and not that tall," in a dark gray shirt with a baseball cap running up Gold Street, where the shooting took place, toward School Street. The defendant does not match that description. But Chhem Pan, who was concededly present at the scene, does, and Rom testified Pan ran from the scene of the shooting, up Gold Street toward School Street. Indeed, Lowell Police Sergeant Joseph Murray testified that in the course of his investigation, he concluded that the individual described by the disinterested witness as the shooter was, in fact, Pan.

 Despite this, defense counsel, whose representation of the defendant was in many ways excellent, failed to argue that Pan rather than the defendant was the shooter, or that that possibility at least gave rise to a reasonable doubt with respect to the defendant. Counsel has given no good explanation for this. Her affidavit asserts that the judge did not allow her to make such an argument. But as the Commonwealth recognizes, that is not correct. Rather, in the Commonwealth's words, "counsel decided on her own not to present the defense." The sole argument the Commonwealth raises for why the failure to raise this defense was not ineffective assistance of counsel is that the evidence did not support the third-party culprit argument. But as even the evidence I have described above makes clear, the evidence was certainly sufficient to support it. The failure to raise this third-party culprit defense both fell below what properly was expected of counsel, and deprived the defendant of a "substantial ground of defence." Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). It therefore amounted to ineffective assistance of counsel. See id. Although the defendant may well have shot Seng, before concluding that he did and rendering him subject to a twelve- to fifteen-year sentence in State prison, he is entitled to have a jury assess the evidence that Pan may have been the shooter. I would therefore vacate the judgments and remand to allow a new trial at which this defense may be put forward.

 Discussion. The shooting at issue in this case took place in front of 13 Gold Street, a dead-end street in Lowell, one house

 Page 186 

 down the street from the intersection with School Street According to Rom, immediately before the shooting, he, Seng, and Pan, who is skinny and small, were together in front of the house. Rom had stepped away from Seng and Pan to dispose of an empty beer behind the house. As Rom reemerged around the corner of the house, he testified that the defendant, who had previously been present in a car and had left the scene, but who was now on foot, had appeared. There were now four people in front of the house. According to Rom, the defendant raised his arm and shot Seng. Rom testified that Pan then ran up Gold Street toward School Street; after the police arrived, Pan later appeared at the door of the house next door to 13 Gold Street, in which he lived, screaming at his sister, Rom's girlfriend, not to "snitch" or otherwise cooperate with the police investigating the shooting. The police did not question Pan, search his residence, or test his clothing for gunshot residue. Seng did not cooperate with the prosecution or testify. No gun was ever found. And, although the testimony suggests that the defendant may earlier have been looking for Pan -- something that apparently upset Pan -- the testimony reveals no motive for the defendant (or, for that matter, Pan) to have shot Seng. 

 The only disinterested witness, a man who happened to have been picking up a friend across the street at the moment of the shooting, called 911 and told the dispatcher that he had seen three people, including Seng, in front of the house, not four, and that the shooter was skinny and not tall and ran up Gold Street toward School Street.

 It appears that prior to trial it simply had not occurred to defense counsel that Pan had been the individual described by the disinterested witness as the shooter. Counsel appears to have decided to argue, implausibly, that the shooter the disinterested witness described running toward School Street was instead some unidentified, unknown individual. The first time the possibility that Pan might have been the individual described by the disinterested witness was raised at trial was on day four. After defense counsel asked Rom on cross-examination whether he had had a gun on him that day, the prosecutor raised the suggestion that defense counsel might have intended to imply that Pan was a third-party culprit. The prosecutor, seeking to prevent the defendant from raising this third-party culprit defense, argued that such an implication was "too speculative." 

 Surprisingly, defense counsel indicated she had no intention of making such an argument, saying that her argument was simply

 Page 187 

 that the defendant was not the shooter, not that Pan was the shooter. This may have been the first time it occurred to her that the disinterested witness may have been describing Pan. She stated, "Judge, there is a jury instruction also but I haven't asked that it be given. Maybe I need to consider that now too." In any event, the judge concluded that there was no ruling she needed to make at that time with respect to a third-party culprit defense. 

 When cross-examining Sergeant Murray later that day with respect to the individual described by the disinterested witness, defense counsel was obviously surprised when Sergeant Murray stated that he had concluded that that person the disinterested witness described as the shooter was, in fact, Pan. This testimony came out after defense counsel asked whether, when Sergeant Murray had interviewed the disinterested witness later that night, the witness had spelled out his description in more detail. Sergeant Murray said the witness had described the person as an "Asian male, mid-twenties, wearing a long-sleeve shirt either dark gray or dark blue and a dark-colored baseball hat . . . . He was really skinny and not that tall." Defense counsel asked whether the witness was describing "[t]he person that he saw, right?" Sergeant Murray answered, "Chhem Pan, yes. . . . Through the investigation, where he said that person ran and where we learned that Mr. Pan ran, it was apparent that he was describing Mr. Pan running not the shooter." 

 Apparently caught by surprise, defense counsel, rather than taking this as evidence that Pan might have been the shooter -- something that, by identifying a possible alternative assailant, would have been extraordinarily helpful to her case - appears to have shared the premise of Sergeant Murray's statement that Pan was not the shooter. She clearly viewed this statement as harmful rather than helpful to her case, presumably because it undermined the idea that there was an unidentified assailant. Indeed, she said next, "You don't know because you just said apparently. He gave you a description. He never identified Pan, correct?" Sergeant Murray answered, "Not by name. . . . It was apparent to me, based on where Mr. Pan ran and where [the disinterested witness] saw somebody r[u]n, that, when he called 9-1-1, he was describing Mr. Pan and not the shooter." Sergeant Murray never gave any reason for concluding Pan was not the shooter, and again, defense counsel did not press the point.

 Despite the valuable testimony that the police thought Pan had been described by the disinterested witness as the shooter - even

 Page 188 

 stronger where Pan's house was never searched for evidence nor his clothing tested for gunshot residue -- it is clear from a sidebar conversation immediately following the conclusion of Sergeant Murray's testimony that defense counsel still viewed the case through the lens she had brought at the outset, and somehow understood the suggestion that Pan was the person identified by the disinterested witness as harmful to the defendant. She said, "I just want to put something on the record. I think I need to make it clear. . . . I have never ever under any set of circumstances been provided with any identification or report from Sergeant Murray that Pan was ever directly or indirectly, Chhem Pan, identified by [the disinterested witness] in any way, shape, or form. That was information I did not have in a report." She stated that she was not asking the judge to strike any testimony on the basis of this alleged discovery violation, which the judge said she would not do. Defense counsel said, "I just want it clear that this is an identification that should have been put in some sort of report. I don't believe Sergeant Murray ever documented it. And I just want that clear for the record."

 Despite Sergeant Murray having now testified as to his conclusion that the person described as the shooter by the disinterested witness was Pan, in her closing, defense counsel did not make the obvious argument that Pan was the shooter. Rather, she suggested something implausible: that yet another person, some unidentified third party that ran toward School Street, was the person identified by the disinterested witness. This was inconsistent with every witness's description of how many people were in front of the house, and particularly since counsel had questioned Sergeant Murray's basis for his conclusion that the person seen by the disinterested witness was Pan, this argument essentially conceded that Pan, who the jury could readily have concluded was the person observed running, was not the shooter.

 In her affidavit in connection with the motion for a new trial, the only explanation trial counsel gave for failure to raise the third-party culprit defense was "I believe I was precluded by the Court from arguing that a specific person -- Vannara Rom or Mr. Pan -- was a possible third party culprit. I believe I did as much as I could, based on the evidence, to suggest that a third party shot Bo Seng." 

 But, as the Commonwealth acknowledges, the transcript belies that. The judge did not rule that defense counsel could not argue that Pan was the shooter. Rather, in the Commonwealth's words, "counsel decided on her own not to present the defense."

 Page 189 

 At the charge conference prior to closing arguments, the prosecutor said, "I would ask that there be no inferences or references to a potential third-party culprit in the case." He argued that the evidence was insufficient to support an argument that any other identified person was the shooter. Rather than arguing to the contrary, defense counsel said in response, "If [the prosecutor] is asking me if I'm going to stand here and say Mr. Pan shot Mr. Seng, no, I'm not. I am going to attempt to argue inferences, as the Court has indicated, that someone was seen running up the street. And that was the testimony, statement of [the disinterested witness] that was in the 9-1-1 call. Yes, I am going to attempt to do that, judge. Because, otherwise, in all reality I might as well ask the Court to give me a recess and reconvene on Monday so I can redo my whole closing. Because my whole closing, I think the Court is aware, is based on inferences based on his testimony. And I think it's fair game for me to argue reasonable and fair inferences. I am not going to point a finger specifically at one person. I don't have that and I would not do that." 

 The judge did not rule on the question whether there was sufficient evidence to support an inference of third-party culprit -- as should be clear from the discussion above there was -- rather, she said, "In this case I don't think that [defense counsel] is actually presenting evidence or arguing that Mr. Pan committed the crime but I think, based on the evidence that was elicited by the Commonwealth's witnesses that two people left the scene, I think that the defendant is entitled to argue that fact. And so I will decline to give the third-party culprit instruction." Although the judge then "caution[ed defense counsel] to limit her argument to the terms that we've discussed in this charge conference," that was not a ruling that counsel was not permitted to do otherwise. Rather, the judge said counsel was bound to limit her argument precisely because it was on the basis of counsel's representation of the scope of that argument that the judge had concluded that no ruling on the question was necessary. The majority is mistaken when it states that the judge "confirmed" that there was not sufficient evidence to support a third-party culprit argument. Ante at 180. And indeed, in denying the motion for a new trial, the trial judge did not agree that she had precluded defense counsel from arguing a third-party culprit. 

 Rather, in assessing the motion for a new trial, the judge addressed for the first time the question of the sufficiency of the evidence to support such an argument. Despite recognizing that

 Page 190 

 the evidence included "(1) Rom's trial testimony that Pan was present during the shooting; (2) [the disinterested witness's] trial testimony that there were only three people present during the shooting and that someone matching Pan's description was the shooter; and (3) trial evidence showing Rom's and Pan's consciousness of guilt," the judge ruled that "[i]n light of Rom's percipient witness testimony that he saw Sin two to three feet from Seng, saw him raise his hand, heard the gunshot, and saw Seng fall, it is wholly speculative to suggest that Rom or Pan was the shooter." The question at issue, though, was not whether Rom was credible -- that was for the jury -- but whether, regardless of Rom's testimony to the contrary, there was sufficient evidence to support the argument that Pan was the shooter.

 The court majority states that the disinterested witness did not see the shooting and thus could not have known who the shooter was. (Indeed, the majority says that Pan "could not have been" the shooter, ante at 182, which would be true only if Rom was telling the truth.) This is not an argument the Commonwealth raises, however, and significantly, the prosecutor did not ask the disinterested witness what he saw or why he concluded that the individual running up Gold Street was the shooter -- presumably because the prosecutor, like us, did not know the answer to that question. I recognize that if there were a retrial, perhaps the prosecutor would be able to undermine the witness's determination that the individual who ran up Gold Street -- Pan -- was the shooter. That's what makes this a close case. But where the Commonwealth does not make that argument, the court's speculation is not an adequate basis on which to keep an individual incarcerated for twelve to fifteen years.

 The only argument the Commonwealth actually makes before the court for why there was no ineffective assistance of counsel for failure to make the argument that Pan was the culprit is that "[t]he motion judge was well within her discretion to conclude . . . that had counsel tried to present a third-party culprit defense, th[e] evidence would have been too weak and thin to support it." But the question before the court is not a question of admissibility, subject to review for abuse of discretion, it is one of the sufficiency of the evidence to support the argument, and that is a question of law that the court reviews de novo. Tellingly, the Commonwealth does not argue that the motion judge was actually correct as a matter of law. Nor could it successfully do so, because she was not: The testimony recited by the 

 Page 191 

Commonwealth -- "1) [the disinterested witness] testified that he saw three people (including the victim) just before the shot, whereas Vannara Rom testified there were four; 2) In his 911 call, [he] said that the 'shooter' was a short, skinny Asian male who ran toward School Street (though he never testified that he saw who fired the shot); 3) Vannara Rom and Chhem Pan ran away instead of calling 911 or going to the victim's aid; 4) Chhem Pan yelled at his sister not to 'snitch' immediately after the shooting" -- combined with the testimony that Sergeant Murray had himself concluded that the person described by the 911 caller as the "shooter" was Pan, obviously sufficed to raise the issue whether Pan was a third-party culprit. 

 The Commonwealth, therefore, is incorrect when it argues that because of evidentiary insufficiency, "it is irrelevant whether the trial judge actually precluded counsel from presenting a third-party culprit defense (as counsel appears to recall based on her affidavit) or whether counsel decided on her own not to present the defense (as the trial transcript suggests)." If the judge did not preclude it -- and she did not -- failure to argue that Pan was the shooter fell below what one would expect of an ordinary, fallible lawyer, and deprived the defendant of a "substantial ground of defence." Saferian, 366 Mass. at 96. 

 The defendant may be guilty of the crime for which he was convicted, and he may therefore deserve to spend twelve to fifteen years in State prison. But under our case law, before convicting him, the jury should have been asked to consider whether Pan, not the defendant, committed the crime. I would vacate the judgments and remand to allow for a new trial at which this substantial ground of defense can be submitted to the jury for its consideration. With respect, I therefore dissent.

FOOTNOTES
[Note 1] The defendant also filed a notice of appeal from the judgments. The only arguments he raises now on appeal pertain to the order denying his motion for a new trial. 

[Note 2] There was testimony at trial that Serena's full name is Srey Kin. At trial, she was referred to solely as Serena. We do the same for the sake of clarity. 

[Note 3] The residence at 13 Gold Street was a two-family house. 

[Note 4] Vanara Pan lived at 184 School Street. The residence at 13 Gold Street was located on the corner where School Street and Gold Street intersect. As a result, the apartment building, which comprised of both 184 and 186 School Street, was directly next to the residence located at 13 Gold Street. 

[Note 5] Because Vanara Pan and Chhem Pan share a last name, we refer to them hereafter by their first names to avoid confusion. 

[Note 6] At trial, it was not entirely evident what the animus between Vanara and the defendant was or why she directed him to leave. She testified that, while she was not friends with the defendant, she knew of him socially. She stated that she had recently attended a birthday party for the child of the defendant's girlfriend, Jocelyn Coppola. Vanara did, however, testify that Coppola had also dated Chhem. 

[Note 7] Dr. Kevin O'Connor, the physician responsible for the victim's care at Spaulding Rehabilitation Hospital, testified that "[p]araplegia is where [the] spinal cord ha[s] been affected. And paraplegia refers to the lower half of the body, specifically the legs." 

[Note 8] The defendant was also charged with armed assault with intent to murder, but the jury were unable to reach a verdict on that charge. The trial judge declared a mistrial as to that count, and the Commonwealth filed a notice of nolle prosequi. 

[Note 9] Coppola's cell phone had been without power earlier that evening, and as soon as she was able to turn it back on, she received the phone call from Vanara. In her affidavit, Coppola stated that, because her cell phone had been "dead," she assumed that the defendant was unable to reach her, and as a result, went looking for her on Gold Street. 

[Note 10] Coppola also stated in her affidavit that she was not aware of any "beef" between Chhem and the defendant. She stated that at the time of the incident, she was not pregnant with Chhem's child, despite the fact that around the same time, Vanara had posted on the social media site Facebook that Coppola was a "whore" and that she was pregnant with a child that was not the defendant's. 

[Note 11] As discussed infra, a police witness testified incorrectly on redirect examination that GSR testing must be performed within a three-hour period in order to be effective. 

[Note 12] Although there was no evidence of the distance between the two addresses at trial, the Commonwealth was prepared to rebut any alibi defense with evidence that it would have taken the defendant approximately two and one-half minutes to drive from 13 Gold Street to 6 Fernald Street. 

[Note 13] We do not believe that trial counsel was ineffective for stating in her opening that the defendant was on Fernald Street at the time of the shooting, but then not putting forth any evidence to that effect. "That evidence promised in an opening statement does not materialize does not necessarily amount to ineffective assistance." Commonwealth v. Jenkins, 458 Mass. 791, 810 n.16 (2011). Trial counsel's statement was brief and nonspecific, and we discern no prejudice. 

[Note 14] Third-party culprit evidence "must be relevant, not too remote or speculative, and must not confuse the jury by diverting their attention to collateral matters." Phinney, 446 Mass. at 163. At the charge conference, trial counsel stated, "I am not going to point a finger specifically at one person. I don't have that and I would not do that," thereby suggesting that she believed arguing that a specific person committed the crime would be too speculative. Instead, she indicated that she was going to "argue reasonable and fair inferences based on the evidence that was presented to this jury," which is the proper scope of closing argument. See Commonwealth v. Hoppin, 387 Mass. 25, 30 (1982). 

[Note 15] During the charge conference, the judge stated, "[S]o long as [trial counsel] is not suggesting another name or another culprit for the shooting, th[en] she's entitled to argue from the evidence that was admitted at trial which was that there were two people identified as having left the scene." The judge further stated, "I don't think that [trial counsel] is actually presenting evidence or arguing that [Chhem] committed the crime but I think, based on the evidence that was elicited by the Commonwealth's witnesses that two people left the scene, I think that the defendant is entitled to argue that fact. And so I will decline to give the third-party culprit instruction. And I do caution [counsel] to limit her argument to the terms that we've discussed in this charge conference." 

[Note 16] While the audio recording of the 911 call is not in the record and we have not heard it, the 911 dispatcher testified that Faria provided a description of the shooter which was a person "in a dark gray shirt with a baseball cap." Sergeant Murray testified that later that evening, Faria elaborated on the description, providing that "[t]he person that he saw" was an "Asian male, mid-twenties, wearing a long-sleeve shirt either dark gray or dark blue and a dark-colored baseball hat," and that the person "was really skinny and not that tall." Sergeant Murray testified that through investigation, it became apparent Faria was describing the person that he saw running, which was Chhem. 

[Note 17] The defendant submitted as an exhibit with his motion for a new trial the Massachusetts State Police's protocol for GSR testing, which provides that the Massachusetts State Police crime laboratory will not examine GSR kits collected after four hours on live individuals. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.